RIGOBERTO MOLINA SANTANA, peticionario y apelante, *v.* GERARDO DELGADO, JEFE DE LA PENITENCIARÍA ESTADUAL, demandado y apelado.

*Número:* AP-65-35    *Resuelto:* 6 de junio de 1968

*Edna Abruña Rodríguez, E. Armstrong de Watlington* y *Enrique Miranda Merced,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Elpidio Arcaya, Procurador General Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Declarado sin lugar por el Tribunal Superior, Sala de San Juan, el recurso de hábeas corpus, basado en que el apelante no tuvo representación legal adecuada en un caso de asesinato y portación de armas, apunta el apelante ante nos que dicho tribunal incidió al determinar que el peticionario tuvo una adecuada representación legal en la vista de dichos casos en 12 de junio de 1962, que resultó en su convicción de los delitos de asesinato en segundo grado y portación de armas. Los hechos que motivaron las acusaciones en este caso ocurrieron en 24 de abril de 1961. La sentencia fue dictada en 18 de junio de 1962.

Las circunstancias del caso relacionadas a continuación demuestran que no tiene razón.

Al iniciarse la vista del caso de asesinato en primer grado y portación de armas, la representación legal del apelante solicitó que los peritos que un mes antes habían determinado que el apelante era procesable lo volviesen a examinar. Así lo hicieron e informaron que estaba en condiciones de ser enjuiciado. Habiendo renunciado al derecho de ser juzgado por un jurado, el apelante se declaró culpable de asesinato

en segundo grado. El incidente sobre este particular fue el siguiente:

"SR. FISCAL:

Con la venia del Hon. Tribunal. Deseamos informar que el Pueblo llevará el caso por Asesinato en Segundo Grado.

HON. JUEZ:

¿Alegación entonces?

LIC. JULIÁ:

Siendo esa la situación, señor Juez, entonces el acusado por nuestro conducto, va a hacer alegación de culpabilidad de Asesinato en Segundo Grado.

HON. JUEZ:

P. Don Rigoberto, usted ha oído la alegación que hace su abogado declarándolo culpable de Asesinato en Segundo Grado?

R. Sí, señor.

P. ¿Usted hace suyas las palabras del letrado?

R. Sí, de mi espontánea voluntad.

P. ¿Nadie lo ha obligado, o coaccionado?

R. Absolutamente nadie.

P. ¿Nadie le ha hecho promesa de beneficio o recompensa?

R. No, señor.

P. ¿Usted ha discutido con el Lic. Juliá de su caso y conviene usted con su abogado que es culpable del delito de Asesinato en Segundo Grado?

R. Sí, señor.

P. ¿Usted sabe que tenía derecho a que se le presentara la prueba en contra de usted, y usted presentar prueba si la tenía?

R. Sí, señor.

P. ¿Usted renuncia a eso y admite que es culpable de los hechos?

R. Sí, señor Juez.

J. Hay también, compañero, el caso M-61-823, misdemeanor.

LIC. JULIÁ:

Damos por leída en cuanto al portar armas y hace alegación de culpabilidad.

HON. JUEZ:

P. Don Rigoberto, oyó la alegación de culpabilidad que hace el letrado en este caso que se le imputa a usted que el día 24

de abril de 1961, usted portó un cuchillo, el cual lo usó en la comisión de un delito de Asesinato?

R. Sí, señor.

P. ¿Y está de acuerdo?

R. Sí, señor.

P. ¿Y la formula voluntariamente?

R. Sí, señor.

P. ¿Nadie lo ha amenazado para que se declare culpable?

R. Absolutamente nadie.

P. ¿Nadie le ha hecho promesas?

R. Nadie.

P. ¿Ha discutido usted el caso con el letrado señor Juliá y conviene que efectivamente usted es culpable de esos hechos?

R. Sí, señor."

A los efectos de sostener su apuntamiento, el apelante hace un resumen de la prueba pasada en la vista de este caso en el tribunal de instancia. Veamos nuestra propia relación de la misma.

El testigo José O'Ferral Santos, custodio de récords de la Administración de Veteranos, testificó que de los récords del apelante que tenía ante sí aparecía que en 1949 el apelante fue admitido en la Clínica Juliá por sufrir de una condición de esquizofrenia. Se le reconoció un 100% de incapacidad. Luego iba a tratamiento ambulatorio en la Clínica neurosíquica de la Administración de Veteranos. Estuvo recluido en la Clínica Juliá del 7 al 11 de marzo de 1961. De un examen siquiátrico que se le hizo en 1956 el diagnóstico fue "Psycotic reaction, psycotic personality." Igual diagnóstico se le hizo en 1955. El último, en 1963, fue de "Schizoprenic reaction, catatonic . . . ."

El testimonio del apelante ha sido resumido correctamente por el Procurador General, con algunas modificaciones que le hemos hecho, así:

Atestigua Molina Santana ser veterano y estar recibiendo una pensión de un cien por ciento de incapacidad. Declara

que originalmente fue acusado de un delito de asesinato en primer grado; que contrató los servicios profesionales del Lic. Charles H. Juliá para que lo defendiera en el juicio "al tiempo" de haber sido acusado y luego de estar bajo fianza. Ésta se expidió en 14 de agosto de 1961. Visitó varias veces a su abogado en las oficinas de éste, en el Capitolio. Había conferenciado con el abogado cerca del tribunal, y aunque estuvo varias veces a verlo, solamente pudo hacerlo en una ocasión, cuando pudo conferenciar con el letrado y en cuya ocasión dice haber pagado por los servicios. Afirma que el caso fue suspendido en varias ocasiones, pero que nunca llegó a un acuerdo con el abogado respecto de lo que se iba a ver en el caso. Dice que informó a su abogado que tenía un testigo y que le había pedido que lo citara, pero el letrado le indicó que no hacía falta.

Afirma el peticionario que no estuvo conforme con el servicio que le prestó su abogado porque a pesar de que el peticionario pidió a su abogado que citara los médicos de la Administración de Veteranos, no lo hizo, ni gestionó la presentación de los récords del peticionario obrantes en los tribunales civiles. Declara finalmente que él hizo alegación de culpabilidad porque su abogado le había dicho que así lo hiciera y porque "El doctor Galíndez me dijo que cogiera los consejos porque me podría si me declaraban loco"; que sabía de antemano la sentencia que le habrían de imponer y porque el propio siquiatra también le aconsejó que era preferible recibir una sentencia de 10 a 15 años a tener que permanecer recluido en el manicomio por toda la vida. Aunque hizo alegación de culpabilidad nunca se sintió culpable. Invoca para tal cosa afirmar, su condición de enfermo mental, "por haber visto y oído animales detrás de él que le decían 'vivo o muerto' y que fue así que tiró y que cuando despertó en su casa fue que le informaron que había matado a uno." Dijo, sin embargo, que no se dio cuenta de lo sucedido.

El Lic. Juliá testificó que:

Ejerce la profesión de abogado desde hace treinta años. Conoció al acusado cuando éste fue a contratarlo para que lo defendiera en un caso de asesinato. Entrevistó al peticionario en una o dos ocasiones. El caso se había suspendido varias veces y el abogado supo que el acusado había estado bajo tratamiento siquiátrico. Se entrevistó con el fiscal Torres González, quien le informó que había ordenado un examen siquiátrico a raíz de la ocurrencia de los hechos.

Declara el letrado Juliá que el acusado le había contado la versión de los hechos de una manera. Le preguntó al acusado si tenía testigos y Molina Santana le dijo que no tenía. Según le informó el acusado, éste había llegado a un establecimiento público con un cuchillo; que una persona le había pedido al acusado que le entregara el cuchillo y que el acusado lo había invitado a que se lo quitara. Que comenzaron a pulsear y que al caerse la persona resultó herida. La investigación que practicó el abogado sobre los hechos demostró que todo había ocurrido en forma distinta. Los testigos del fiscal sostenían que el acusado se había presentado al lugar con un cuchillo y sin que mediaran palabras acuchilló a la víctima por el estómago.

Dijo que tan pronto se enteró del historial del caso, gestionó que al apelante se le hiciese un examen siquiátrico e insistió que el Dr. Señeriz fuese parte del panel que lo examinó pues había sido médico de cabecera del apelante. Dicho panel concluyó que el apelante "estaba en condiciones aptas para entrar a juicio." Recuerda haber visto informe de un siquiatra al efecto de que en el momento de ocurrir los hechos, el apelante no estaba mentalmente enfermo, pero no recordó su nombre. Aclaró que el apelante lo fue a contratar muchos meses después de ocurridos los hechos. Admitió que una persona procesable en el momento de la vista pudo no estar cuerda durante la comisión de los hechos. Preguntado si era posible que dos meses después un siquiatra examine

una persona a base de su historial médico anterior y encuentre que hay la posibilidad que estuviera esa persona sufriendo una enajenación mental cuando se cometieron los hechos, contestó que en su experiencia los siquiatras informaban que no podían. Dijo que a su juicio "al decir los siquiatras que el hombre era procesable eso descarta la tesis de locura."

El Dr. Galíndez, uno de los siquiatras que en varias ocasiones examinó al apelante, testificó que examinó al apelante en abril de 1962 y en cuatro ocasiones lo examinó junto con los siquiatras Valderrábano, Señeriz y Tejedor, a los fines de determinar su procesabilidad. Llegó a la conclusión que sufría de una reacción esquizofrénica de tipo paranoide en remisión de síntomas, queriendo decir con esto que "Los síntomas que caracterizan a esto [la enfermedad mental] han desaparecido." Preguntado si podría "determinar si para el año 1961 esa persona [el apelante] podría estar bajo los efectos de un estado mentalmente dudoso", contestó que:

"Indudablemente. Para contestar esa pregunta tendría que haber, con certeza, tendría que haberme basado en un examen squiátrico-directo [*sic*] mientras más próximo esté el examen; si este examen hubiera sido a raíz de la comisión de delito, con más certeza y base científica, le podría decir si este individuo padecía de tal o cual probabilidad. En términos generales le podría decir que podría o no estar enfermo.

P. Por ejemplo, que estuviera en tal estado mental que no pudiese distinguir entre el bien y el mal.

R. La potencialidad existe en todo el mundo.

P. ¿Usted no podría hacer esta determinación ni pudo hacerla aquel día?

R. Para remontarme al '61, no. Digo, él tiene un historial de haber estado enfermo, me imagino que habrá material de médicos que lo examinaron, me imagino. Yo no podría . . . ."

En *Pueblo* v. *Sánchez*, 79 D.P.R. 116 (1956), dijimos que la locura del acusado en el momento de cometer el hecho delictivo es lo que le exime de responsabilidad criminal; que

su conducta antes o después de los hechos no prueba que un acusado estuviera loco en el momento de cometer los hechos; que la prueba pericial sobre el estado mental del acusado luego de la comisión de los hechos es admisible en apoyo de su defensa de locura pero de haber prueba pericial que ataca la credibilidad de aquella "corresponde al jurado determinar a cual de los dos testimonios iba a dar crédito"; que prueba pericial no es obligatoria para los juzgadores y al apreciar la prueba, el juzgador no está obligado a aceptar las conclusiones de un perito.

En *Pueblo* v. *Alsina*, 79 D.P.R. 46 (1956), adoptamos la siguiente norma:

"En nuestra opinión la norma de prueba que debe regir cuando se plantea la locura como eximente de responsabilidad es la que pasamos a exponer. La ley presume que el estado normal es el de la cordura, presunción justificada por la experiencia humana y por consideraciones de orden público, y por ende, que el procesado estaba en su sano juicio en el momento de perpetrar el acto que se le imputa como delito. En virtud de esa presunción El Pueblo no tiene que presentar prueba alguna para demostrar que el acusado estaba cuerdo en ese momento, *mientras* no se ofrezca y reciba evidencia que pueda engendrar duda razonable sobre la cordura, evidencia que debe ser presentada por el encausado, si es que descansa en la ausencia de sanidad mental como eximente de responsabilidad, pero que también puede provenir de la evidencia aducida por el Pueblo al presentar su caso, . . . . Sin embargo, una vez que en la causa existe prueba capaz de crear esa duda, la presunción de que el acusado estaba en su sano juicio en el instante de perpetrar el acto, queda rebatida y el ministerio fiscal obligado a probar el sano juicio al igual que cualquier otro hecho. El juzgador, con vista de toda la prueba presentada en cuanto al acto imputado y a la locura, tiene entonces la obligación de determinar si el ministerio fiscal ha probado la sanidad mental del reo, su capacidad para delinquir, y si al hacerlo encuentra que tiene duda razonable sobre ello, su deber es dar el beneficio de esa duda al inculpado y absolverle."

■ Aunque prueba pericial de la incapacidad mental del acusado algún tiempo antes o después de la comisión de los hechos es admisible para probar su incapacidad mental en el momento en que los realizó, al medir su peso y credibilidad el juzgador puede tomar en consideración el tiempo transcurrido entre la fecha en que se dictaminó su estado y la fecha en que ocurrieron los hechos. *Harriford* v. *Harriford,* 336 S.W.2d 113, 117 (Mo. 1960); *State* v. *Duncan,* 93 S.E.2d 421, 423 (N.C. 1956); *Poole* v. *State,* 207 S.W.2d 725 (Ark. 1948); *People* v. *Preston,* 173 N.E. 383 (Ill. 1930); *Sherill* v. *State,* 225 Pac. 840 (Col. 1924); *People* v. *Gavrilovich,* 106 N.E. 521 (Ill. 1914); *Swedley* v. *Commonwealth,* 127 S.W. 485 (Ky. 1910); *State* v. *McMurray,* 58 Pac. 961 (Kan. 1899); *People* v. *Hill,* 195 N.Y.S.2d 295, 299 (1960).

■ A la luz de lo expuesto, no desatendió su responsabilidad la representación del apelante en el caso de asesinato al no alegar la defensa de locura. Es cierto que el apelante tenía un historial de esquizofrenia desde mucho antes del día de los hechos.

■ A los fines de establecer la defensa de locura, la mejor prueba obtenible es un dictamen pericial de incapacidad mental como resultado de un examen del acusado "a raíz de la comisión del delito", según testificó el Dr. Galíndez. Dicho médico testificó que si el examen se hace muy tarde, sólo se puede decir "que podría o no estar enfermo." Cf. *Pueblo* v. *Rivera Raquel,* 95 D.P.R. 564 (1967). En lugar de existir tal prueba, el abogado tuvo conocimiento que la prueba disponible era de que entonces estaba cuerdo, como indicamos más adelante.

Por el contrario, con respecto a la información que sirvió de base al abogado de la defensa para su determinación de aconsejar al apelante que se declarase culpable de asesinato en segundo grado, el interrogatorio del abogado de la defensa demuestra lo siguiente:

"P. En alguna forma los siquiatras rindieron algún informe en que dictaminaran que a la fecha de la comisión de los hechos él estaba cuerdo?

R. No, pero *hay un informe de un siquiatra* que no recuerdo quién fue, es un informe que yo vi que como dije el compañero Torres González tuvo la gentileza de mostrármelo, *un siquiatra que tenía el acusado en el momento de ocurrir los hechos, no estaba mentalmente enfermo.*

P. No sabe quién es el médico?

R. No recuerdo.

P. Quién ordenó ese examen?

R. El compañero Roberto Torres González, que fue el Fiscal que investigó estos casos a raíz de ocurrir.

.    .    .    .    .    .    .    .    .

P. Que si en algún momento, sabiendo que este ciudadano tenía los beneficios de ser veterano, si hizo alguna gestión para que le hiciera un examen un médico de la Administración de Veteranos.

R. Sí, yo a insistencia del acusado insistí a su vez en que formara parte del Tribunal de Peritos Siquiátras el doctor Señeriz, unque [*sic*] es médico de una clínica privada tiene el contrato de veteranos.

P. Yo me refiero a raíz de la comisión de los hechos o a raíz de que el fue a hablar por primera vez con usted.

R. No, porque cuando el acusado vino a verme a mí por primera vez, si mal no recuerdo *habían pasado ya meses*, yo diría *como tres o cuatro meses de ocurrir los hechos, de modo que cuando vino donde mí ya había un siquiatra que lo había utilizado el Fiscal a raíz de ocurrir los hechos.*

P. Sabe cuánto tiempo después de la investigación que hizo el Fiscal Torres González fue que se le examinó por el siquiatra del Fiscal al peticionario.

R. Desde la comisión del delito hasta cuál examen?

P. Hasta el examen que él ordenó.

R. Hasta donde yo recuerdo, si mal no recuerdo, estoy hablando de memoria, a él *lo examinó el docotor* [*sic*] *designado por el compañero Torres González.*

.    .    .    .    .    .    .    ..    .

P. Ese informe no lo tenemos a mano?

R. *Yo lo vi hallá* [sic] *para el año 1962, donde puede estar o quien lo tiene no lo sé.*

.    .    .    .    .    .    .    .    .

P. Entonces, usted confió en ese examen del médico del Fiscal.

R. *Lo que ocurrió no es que confiara en él, pedí examen siquiátrico en tres ocasiones, lo que ocurrió fue que ese examen fue tomado el día de los hechos y yo me hice cargo de los hechos meses después,* que pudieron ser dos, tres, cuatro, yo no recuerdo, pero fue meses después.

.    .    .    .    .    .    .    .

R. *La experiencia mía ha sido,* por ejemplo, *voy a citarle el caso* específico de cuando yo defencí [sic] *a Castañeda* yo planteé la cuestión de locura y *vino el historial clínico que era muy parecido al de este acusado, un historial mental clínico posterior y los siquiatras dijeron redondamente en la Corte que ellos no podían decir que en el momento de entrar a la joyería Castañeda estaba loco o no,* es uno de los casos que recuerdo, y entonces, he hablado y discutido con el propio Dr. Señeriz y Dr. Galíndez y todos están contestes en eso.

P. Como abogado en esa contensión sería culpable de un asesinato en primer grado?

R. No, de ser culpable sería de homicidio y posiblemente de homicidio involuntario, pero qué ocurre, que era la tesis de este acusado sola contra el staff de testigos que tenía el Fiscal, que decían que los hechos habían ocurrido en una forma distinta y que no había el jueguito de mano y también un sin número, y también que había habido una puñalada sin provocación, que el acusado había venido y le había metido el cuchillo al individuo y lo había matado.

P. Y aceptando esos hechos y con un historial médico de esa naturaleza, desde '49 hasta el '63, como abogado no era propio pensar que esta persona hubiese estado en esos momentos loca?

R. Sí, excepto que *yo como abogado por no ser siquiatra tenía que descansar en el dictamen de los siquiatras y el dictamen del siquiatra que lo examinó a él inmediatamente que ocurrieron los hechos era de que no estaba mentalmente incapacitado y el dictamen de los peritos después establecía también que el acusado estaba procesable."* (Énfasis suplido.)

■ Ante prueba clara y abundante de la comisión del delito, y la probabilidad de no poder aducir prueba robusta y creíble de que el apelante estaba mentalmente incapacitado en el momento de la comisión del delito, y por lo tanto, ante el riesgo de que el apelante fuese declarado culpable de asesinato en primer grado, no podemos concluir que su representación legal fue inadecuada al hacer alegación de culpabilidad, la que el apelante aceptó y ratificó en la vista del juicio cuando los peritos médicos, luego de examinarlo varias veces, certificaron que los síntomas de su anterior estado mental habían desaparecido y que el apelante estaba procesable.

■ A la luz de las circunstancias previamente relacionadas, no podemos concluir que en este caso hubo una negación fundamental de la justicia. El requisito constitucional de una representación legal que le provea al acusado un juicio justo no quiere decir que todo error de juicio o de estrategia en el juicio o concepto erróneo con respecto al derecho aplicable priva al acusado de ese derecho constitucional. El récord no demuestra que el abogado de la defensa dejase de hacer esfuerzo alguno por allegar evidencia del estado mental del apelante o de que lo examinara un siquiatra ni de allegar prueba de otras posibles defensas de las cuales tuviera conocimiento ni que al ejercer su juicio, lo hiciese sin estar debidamente informado de todas las circunstancias del caso. *United States* v. *Fay,* 348 F.2d 705, 707 (2d Cir. 1965) ; *Hickock* v. *Crouse,* 334 F.2d 95, 100 (10th Cir. 1964) ; *Brubaker* v. *Dickson,* 310 F.2d 30, 37 (9th Cir. 1962). Véase, además, *Stack* v. *Bomar,* 354 F.2d 200 (6th Cir. 1965).

*Por lo tanto, se confirmará la resolución del Tribunal Superior, Sala de San Juan, dictada en este caso en 12 de agosto de 1964.*

El Juez Presidente Señor Negrón Fernández no intervino. El Juez Asociado Señor Santana Becerra disintió en opinión separada en la cual concurren los Jueces Asociados Señores Hernández Matos y Dávila.

—O—

Opinión disidente del Juez Asociado Señor Santana Becerra en la cual concurren los Jueces Asociados Señores Hernández Matos y Dávila

San Juan, Puerto Rico, 6 de junio de 1968

Según las constancias del caso Criminal G-61-619 de la Sala de San Juan del Tribunal Superior, por asesinato, seguido contra Rigoberto Molina Santana, existen los siguientes hechos:

(1) El 8 de junio de 1961 se radicó acusación de asesinato contra Molina Santana porque con malicia premeditada, deliberación, intención y propósito decidido y firme de matar, demostrando tener un corazón pervertido y maligno, le produjo la muerte con un cuchillo al ser humano Guadalupe Cruz Díaz, en 24 de abril de 1961.

(2) En 19 de julio de 1961 compareció Molina Santana a oir la lectura de la acusación, se le proveyó abogado para dicho acto, hizo alegación de inocencia y solicitó juicio por jurado.

(3) En 22 de noviembre de 1961 el acusado, por conducto de su abogado Lcdo. C. H. Juliá, solicitó la suspensión del juicio señalado para el 27 de ese mes por razón de que Molina Santana se encontraba bajo tratamiento siquiátrico en la Administración de Veteranos, y no estaba en condiciones de comparecer a la vista. En esta fecha se pospuso el juicio por incomparecencia del acusado, se ordenó su arresto y se señaló el 12 de marzo de 1962 para la vista.

(4) Hay unida a los autos, fechada 29 de noviembre de 1961, una certificación de la Administración de Veteranos dirigida al Juez Carreira Más, acreditativa de que el veterano Rigoberto Molina Santana estaba bajo tratamiento en la Clínica de Higiene Mental de dicha institución como paciente externo.

(5) Según la Minuta, el 12 de marzo de 1962 y a solicitud de la defensa, el tribunal ordenó la citación de un Tribunal de Peritos Médicos compuesto por los Dres. Señeriz, Valderrábano y Galíndez, del Hospital de Siquiatría, para que comparecieran el 19 de marzo y practicaran un examen siquiátrico al acusado para determinar si estaba en estado de ser enjuiciado. En esta fecha no compareció el acusado.

(6) En 2 de abril de 1962 se reunió el Tribunal de Peritos Siquiatras y luego de examinar al acusado llegaron a la conclusión de que eran necesarios exámenes posteriores sucesivos para determinar su estado mental para ir a juicio. Se ordenó el ingreso del acusado al Hospital de Siquiatría con tal fin.

(7) En 2 de abril de 1962 los Dres. Señeriz, Valderrábano, Galíndez y Tejedor Pascual, dictaminan que, efectuado el examen del acusado, llegan a la conclusión de que debido a la muy escasa colaboración de éste, y a las dudas que les planteaba la exhibición de su sintomatología, recomendaban examinarlo en posteriores y sucesivas entrevistas a fin de poder determinar con certeza plena su condición para ser procesado. Con miras a este informe el 9 de abril de 1962 el tribunal dispuso el ingreso del acusado en el Hospital de Siquiatría, adonde fue trasladado de la Cárcel de Distrito de San Juan.

(8) En mayo 3, 1962, los peritos siquiatras concluyeron que en ese día se encontraba el acusado en condiciones de comparecer a juicio y responder del o de los delitos que se le imputaban. El caso fue señalado para el 8 de junio de

1962, fecha en que se pospuso para el día 12 del mismo mes.

(9) Surge de la Minuta del día 12 de junio que a solicitud de la defensa los Dres. Galíndez, Señeriz y Tejedor examinaron al acusado y encontraron que en ese día podía ser enjuiciado. Acto seguido (a) el acusado renunció su derecho a juicio por jurado; (b) se dio lectura a la acusación grave; (c) el fiscal solicitó permiso para rebajar la calificación a asesinato en segundo grado, y (d) rebajada la calificación, el acusado hizo alegación de culpabilidad. Aparece de la Minuta que la alegación de culpabilidad formulada por el abogado del acusado fue ratificada por éste y el tribunal la admitió por entender que era libre y voluntaria. No surge de la Minuta, ni tenemos la transcripción taquigráfica de los procedimientos en el caso G-61-619, los hechos que permitan conocer qué elementos tuvo ante sí en ese momento la Sala sentenciadora para su conclusión de que se renunciaba al juicio en forma libre y voluntaria.

(10) En 18 de junio de 1962 se sentenció a Molina Santana a una pena de 10 a 15 años de presidio en el caso de asesinato y a 6 meses de cárcel en el caso de portar armas. Hasta aquí las constancias del Expediente de asesinato G-61-619.

Transcurrido poco más de un año, en 18 de noviembre de 1963, Molina Santana interpuso en la Sala de San Juan del Tribunal Superior recurso de hábeas corpus y alegó (1) estar ilegalmente privado de su libertad porque no tuvo la debida asistencia legal en violación del debido procedimiento de ley, y (2) que el tribunal aceptó alegación de culpabilidad, a sabiendas o por error, sin que la misma fuera hecha "de una manera inteligente, ya que el acusado no estaba en condiciones de hacer una alegación inteligente de culpabilidad por estar sufriendo de sus capacidades mentales", sin que dicha alegación de culpabilidad tuviera validez legal alguna.

Expedido el auto y oída la prueba, la Sala de San Juan del Tribunal Superior desestimó el recurso con las siguientes determinaciones:

"CONCLUSIONES DE HECHOS

El día 12 de junio de 1962, y ante el Hon. Baldomero Freyre, compareció el peticionario para la vista en su fondo de los casos G61-619 y M61-823 seguidos contra el aquí peticionario por los delitos de Asesinato y Portar Armas. El acusado estuvo representado por el Lcdo. Charles H. Juliá. Un Tribunal de Peritos Médicos dictaminó que el acusado estaba procesable. Después de este dictamen, el acusado representado por el Lcdo. Juliá, hizo alegación de culpabilidad por los delitos de Asesinato en Segundo Grado y Portar Armas. Con posterioridad a este acto el acusado fue sentenciado.

CONCLUSIONES DE DERECHO

El peticionario tuvo una adecuada representación legal en los casos mencionados. Estaba mentalmente capacitado cuando hizo la alegación de culpabilidad. Su reclusión es por lo tanto legal.

Se declara sin lugar el recurso de Hábeas Corpus.

Notifíquese:

Dada en San Juan, Puerto Rico, a 12 de agosto de 1964."

Este recurso es la apelación de Molina Santana contra el anterior fallo.

Antes de seguir adelante procede la observación que la Sala sentenciadora limitó su anterior pronunciamiento al hecho de que el peticionario había tenido una adecuada representación legal y que estaba mentalmente capacitado cuando hizo la alegación de culpabilidad. Obviamente la Sala se refería al hecho de que los peritos siquiatras habían dictaminado que en ese día, el apelante podía ser procesado.

Un análisis de toda la prueba en conjunto y demás circunstancias a ser consideradas me hace concluir que la cuestión a resolver, a la luz de esa evidencia y circunstancias, penetraba más profundamente en el aspecto fundamental, para el debido procedimiento y las garantías del ciudadano,

de si aquella declaración de culpabilidad fue libre y espontánea y no se debió a otras consideraciones que pudieron haber influido la mente, incuestionablemente no saludable, del acusado. Hay diferencia entre el hecho de que los peritos manifestaran que en ese día el acusado podía ser sometido a un juicio—si estaba en condiciones de entender su proceso racionalmente—y el otro hecho de renunciar, con la debida comprensión y sin presión o influencia de índole alguna, a una garantía constitucional de extrema importancia como lo es el juicio adversativo, mecanismo éste que con la confrontación de testigos y el vehículo del contrainterrogatorio constituye hoy por hoy como se ha dicho, y aun cuando no llegare a la verdad absoluta, la mejor manera de esclarecer la verdad de unos hechos ante la justicia.

El historial previo a esa declaración de culpabilidad según surge de la transcripción de la prueba oral en adición a las constancias del expediente a que me he referido al principio, es así:

De acuerdo con los récords médicos de la Administración de Veteranos, el peticionario fue admitido en 1949 en la Clínica Juliá y pensionado por una condición de esquizofrenia relacionada con su servicio militar. Se le compensó a base de 100% de incapacidad mental. En 1960 recibía tratamiento como externo en la Clínica Neurosíquica de la Administración. Se le recluyó en la Clínica Juliá de marzo 7 a marzo 11, 1961, por su condición de esquizofrenia.[1]

En 1955 y en 1956 se le habían hecho exámenes siquiátricos siendo el diagnóstico el de "reacción de sicosis, persona sicópata."

Un examen de 9 de mayo de 1963 (posterior a los hechos delictivos y posterior al proceso) diagnosticó reacción esquizofrénica.[2]

---

[1] El episodio que pudo haber dado lugar a esta reclusión fue cercano a la comisión del delito, en abril 24, 1961.

[2] "Catatonic".

El peticionario declaró que recibe 100% de pensión como veterano desde hace mucho tiempo y nunca se la han quitado. Tiene un tutor. Al preguntársele porqué hizo alegación de culpabilidad, contestó:

(R. pág. 15)

"Porque el licenciado me dijo que a mi que me iban a echar cadena perpetua y el doctor Galindez me dijo que cogiera los consejos que me *podría* si me declaraban loco.

P. ¿Usted tenía miedo?

R. Seguro."

El peticionario admitió que lo examinaron ese día para ver si podía ser enjuiciado. No recordó cuanto duró el examen; fue en la celda de detención y el Dr. Galíndez le dio una pastilla. (³)

El peticionario declaró que por consejo de su abogado había aceptado declararse culpable "en la forma que me lo dijo lo cogía yo, o . . . ." (R. pág. 38)

Más adelante, a preguntas del fiscal (R. pág. 46):

"P. Y quienesquiera que estuvieran ese día y lo hubiese examinado a usted allá en ese día volvieron a informar al Tribunal que usted estaba en estado procesable?

R. Sí, señor lo dijeron.

P. Y eso usted interpretó antes de hacer la alegación de culpabilidad?

R. Sí, naturalmente, me enteré.

P. O sea que ese día usted podía distinguir entre el bien y el mal a todos los efectos y podía ayudar a su abogado?

R. Ya estaba preparado de antemano con lo que me había dicho el abogado, ya yo sabía lo que me iban a echar.

P. Usted habló con él?

R. Yo no, pero me acuerdo que el abogado había hablado.

---

(³) La Minuta del día del juicio expresa que el Dr. Galíndez examinó al peticionario y lo halló en estado de ser enjuiciado. Las partes *estipularon* que ese sería el dictamen de los Dres. Señeriz y Tejedor.

P. Le pregunto si no dijo aquí esta mañana que el siquiatra Galíndez, qué fue lo que le dijo el siquiatra Galíndez?

R. Que cogiera los consejos de mi abogado y cogiera de diez a quince que era mejor que estar en el manicomio toda tu vida."

(R. pág. 48)
(Fiscal)

"P. Y vamos ahora a los exámenes esos, cuando lo examinaron no le preguntaron nada a usted los siquiatras?

R. Así, preguntas, pero yo no puedo recordar las preguntas que me hacían.

Hon. Fiscal:
Que indique como fue el hecho ese.
Testigo:
R. Señor Juez, lo primero que le preguntan a uno a como estamos hoy, quien es el presidente de Estados Unidos, quien es el gobernador de Puerto Rico, pues seguro si yo conozco a Luis Muñoz Marín.

P. Entonces tenemos que en cuanto al día de los hechos el día que hizo alegación de culpabilidad, usted hacía alegación de culpabilidad primero porque según usted le ofrecieron de 10 para 15 y segundo porque sentía que era culpable?

R. No señor, yo no me sentí culpable nunca del delito cometido y ni aun tampoco.

P. Entonces usted no se siente culpable del delito cometido?

R. Yo no niego que lo cometí, no soy culpable de mis hechos.

P. Usted no niega que lo cometió pero dice que no es culpable.

R. No.

P. Yo quiero saber como usted armoniza que usted diga que cometió el delito y no lo comete.(⁴)

R. Yo puedo informar al Tribunal en la forma en que lo

---

(⁴) En esta aparente contradicción descansa precisamente el punto crucial ante nos, basado en la no responsabilidad delictiva por razón de irresponsabilidad mental.

cometí; yo salí de la Clínica Juliá por mi cuenta y desde que llegué a casa empecé a ver como animales detrás de mí. (5)

P. Y no era una mujer?

R. Eso lo explica y oí que decía vivo o muerto y ahí primero me pegó y yo tiré y cuando desperté en la casa me dijeron que había matado a uno, pero no me di cuenta, no fue premeditado, nunca he matado, en el ejército por obligación.

P. Y andaba con el cuchillo?

R. Lo cogió de un mostrador el amigo mio.

P. Como usted sabe que cogió el cuchillo del mostrador?

R. El paciente tiene momentos de lucidez que puede acordarse.

.       .       .       .       .       .       .       .       .

P. De eso se queja de que le echaron 10 para 15, no de que eran 900 dólares?

R. Realmente no cometí el delito ni lo premedité porque por veteranos yo peleé tres años en el campo de batalla; se debería tener en cuenta que a Castañeda le echaron 10 para 15 concurrente y yo que soy un enfermo me deberían echar menos; lo que le pedía al abogado era que peleara el caso . . . el doctor me dice coge los consejos te vas a podrir en el manicomio . . . . Yo le dije al doctor que si me echaban perpetua me mataba."

.       .       .       .       .       .       .       .       .

(Defensa) (R. pág. 54)

"P. Y usted que a la persona que le dio muerte era un amigo suyo:

R. Un amigo mío que yo lo siento en el alma que nunca hizo nada."

El Lcdo. Juliá declaró sobre su gestión profesional en este caso. Se hizo cargo del mismo muchos meses después de ocurridos los hechos, razón por la cual no pudo disponer su examen siquiátrico a raíz de los hechos, más confiable, por la cercanía de los mismos, del estado mental del peticionario al realizarlos. El peticionario le dio una versión de cómo

---

(5) Los récords médicos demuestran que el peticionario estuvo recluido en la Clínica Juliá del 7 al 11 de marzo de 1961 sin exponer cómo salió. El peticionario dice que se fue por su cuenta. El delito se cometió el 24 de abril, poco tiempo después.

sucedieron y el letrado sabía que los testigos de cargo ofrecían una versión distinta.

El récord demuestra que el Lcdo. Juliá fue siempre muy diligente en ver que el peticionario no fuera enjuiciado sin estar en condiciones mentales de serlo. Solicitó varios exámenes siquiátricos. El dictamen de los mismos, sin embargo, no resolvía si al tiempo de cometer los hechos el peticionario tenía responsabilidad criminal o no. No resolvía la *defensa* de locura en los méritos.

El Dr. Galíndez declaró, traído por el fiscal, que examinó al peticionario en abril de 1962 y luego el día del juicio, con el objeto de determinar su condición para ser procesado. Se concluyó que para el día del juicio podía serlo.

A preguntas del peticionario dijo que llegó a la conclusión de que para la fecha del juicio, junio 12, había una reacción "esquizofrénica" de tipo paranoide en remisión de síntomas. Explicó que por remisión de síntomas quería decir que habían desaparecido ciertos síntomas que presentaba el paciente cuando se le examinó por primera vez el 2 de abril. La condición mental del peticionario se determinó en ambas ocasiones, abril 2 y junio 12, 1962, a los fines de ser o no enjuiciado, no su condición al cometer el delito, más de un año antes.

Declaró el Dr. Galíndez que indudablemente el peticionario podía estar en un estado mental dudoso al ocurrir los hechos; que para contestar con mayor certeza tenía que basarse en un examen siquiátrico más próximo a los mismos; podría decir que pudiera o no estar enfermo. Esa determinación no podía hacerla remontándose al 1961, aunque observó el facultativo que el peticionario tenía un historial de haber estado enfermo y se imaginaba que habría material de los médicos que lo examinaron.

Es claro que el Dr. Galíndez circunscribió su dictamen a la condición de poder ser enjuiciado, sin entrar en el aspecto de la *locura como defensa*. No obstante, el récord taqui-

gráfico deja la fuerte sensación en los procedimientos ante la Sala de instancia, que porque se le declaró mentalmente competente para enfrentarse a un juicio, una defensa de locura quedaba desvirtuada o no podría tener éxito.

Según el récord, la declaración que parcialmente se copia a las páginas 12 a 15 de la opinión de la mayoría, termina así en cuanto a la defensa de locura: (R. pág. 21)

"P—Entonces, para descartar la *defensa de locura* tomó en consideración dos factores, dos declaraciones juradas de testigos que el Fiscal tuvo la gentileza de mostrarle(6) y la declaración del siquiatra que lo examinó poco tiempo después de los hechos?(7)

R—Como verá el compañero por el expediente yo no descarté la tesis de locura yo volví a plantear la cuestión de locura yo no la descarté la descartaron los siquiatras. *Si una persona está procesable indica que no se puede plantear la cuestión de locura porque la tesis es que sabe la distinción entre el bien y el mal.*

P—Entonces, usted hizo una evaluación a base de que *al decir los siquiatras que el hombre era procesable eso descarta la tesis de locura?*

R—*A mi juicio sí.*

P—Nada más, Vuestro Honor." (Énfasis nuestro.)

La petición de hábeas corpus se basó en que el peticionario no estuvo debidamente defendido y en que su enfermedad mental no le tenía en condiciones de renunciar inteligentemente sus derechos constitucionales.

Un recurso de hábeas corpus, una vez expedido el auto, deja de ser un procedimiento corriente entre dos partes. Se convierte en una encuesta que abre el Estado mismo para examinar sus propias actuaciones al privar de la libertad a un ciudadano. Los tribunales en tal caso no están obligados ni limitados por las alegaciones específicas que haga un peticionario.

---

(6) No eran testimonio pericial.

(7) Este examen que se dice fue hecho a instancias del fiscal, no fue producido por éste en la vista del hábeas corpus, a pesar de solicitarse.

Tengo la convicción firme que aquí no hubo un caso de indefensión o falta del letrado en el cumplimiento de su deber con su cliente. No necesito prueba, porque me es sabido de propio conocimiento, de la capacidad, experiencia e idoneidad del Lcdo. Juliá en el ejercicio de su profesión, así como de su incuestionable sentido de dedicación a las causas que defiende. En las circunstancias ante sí, él usó su honesto y mejor criterio en cuanto a la manera de proteger a su defendido a la luz de los medios que él creía tener disponibles.

Pero esto, sin embargo, la estrategia del letrado de la defensa o su criterio sobre la prueba disponible, no es el problema fundamental que el recurso presenta. El problema básico es si la declaración de culpabilidad fue enteramente libre y voluntaria, que respondiera sólo a un deseo de conciencia de confesar judicialmente la culpa, sin que en la mente enferma del peticionario, al seguir el consejo de su abogado en ese momento, influyeran otras consideraciones que le infundieran miedo, temor o conveniencia.

El récord me convence que no fue un acto puro de conciencia. Lo declarado por el peticionario en el sentido de que el Dr. Galíndez le aconsejó que siguiera el consejo de su abogado, que era mejor ser declarado culpable que ser declarado loco porque entonces se "podría" en un manicomio, no fue en forma alguna desvirtuado. El Fiscal sentó al Dr. Galíndez en la silla de testigos y tuvo oportunidad de desmentir al peticionario en esos extremos. No lo hizo.

Por otra parte, el hecho de que no se hiciera un examen siquiátrico cercano a la comisión de los hechos no hería de muerte la *defensa* de locura. Como advirtió el Dr. Galíndez, el peticionario tenía un largo historial de enfermo mental, comenzado en 1949 con el diagnóstico ya de esquizofrenia, ratificado en 1955 y 1956, un sicópata, y en marzo de 1961, poco antes de dar muerte. Aún después de sentenciado, en 1963, seguía siendo un sicópata. Ese largo historial de sicosis, que aparecía en los récords de la Administración de Vete-

ranos y de la Clínica Juliá unido a otras circunstancias como la aparente ausencia de motivo para dar muerte, podía dar base suficiente para que un jurado, en un juicio adversativo, pasara sobre la responsabilidad criminal de Molina o su irresponsabilidad.

Sólo apunto el hecho que una *defensa* de locura no era inexistente para el peticionario. No voy a considerar, como en la opinión mayoritaria, la doctrina y métodos a seguirse cuando se interpone dicha defensa. En este recurso no es necesario entrar en ese campo, ya que con la declaración de culpabilidad el peticionario no tuvo la oportunidad de interponer la misma. Esta fue una declaración de culpabilidad convenida, sin duda alguna en lo que se creyó que era la mejor estrategia de defensa, en que la rebaja del delito y la amenaza infundida de "podrirse" en un manicomio fueron factores que influyeron en la mente débil y enferma del peticionario.

Bajo la acción remediadora que ahora suple la Regla 192.1 de las de Procedimiento Criminal adoptada según la Ley Núm. 99 de 2 de junio de 1967, es mi criterio que la declaración de culpabilidad debe dejarse sin efecto, así como la sentencia, y permitirse a Molina Santana un juicio plenario.

Si no incurrió en responsabilidad criminal al dar muerte, el sentido correcto de la justicia me dice que no debe cargar él, ni sus hijos, con el baldón de una convicción penal, aunque pase sus días en un manicomio o hasta su curación, si es que privó de la vida sin responsabilidad.

La expresión de que en este caso no hubo una negación sustancial de la justicia me parece irreal cuando en las circunstancias de este caso se ha privado a un ciudadano mentalmente incapacitado del más alto valor de la justicia criminal, del juicio plenario en los méritos sobre su culpabilidad o inocencia.