EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN COLÓN MORALES, acusado y apelante.

*Número:* CR-70-52      *Resuelto:* 11 de junio de 1971

*Enrique Miranda Merced,* abogado del acusado; *Gilberto Gierbolini, Procurador General,* y *Candita R. Orlandi, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

El apelante fue convicto del asesinato de su esposa y de su hijo. A tenor con la Regla 76 de Procedimiento Criminal levantó la defensa de locura. Fue sentenciado a cumplir en un caso cadena perpetua y en el otro de 15 a 20 años de

presidio. (¹) En apelación señala como errores que el Ministerio Público no cumplió su obligación de probar la sanidad mental del acusado fuera de toda duda razonable y que el tribunal incidió al instruir al jurado sobre la defensa de locura.

Aparece de los autos lo siguiente: Los hechos fueron cometidos el 25 de julio de 1967. El apelante fue declarado en estado no procesable el 4 de junio y el 6 de agosto de 1968. A solicitud del Ministerio Fiscal, el 4 de octubre el tribunal ordenó la excarcelación del acusado ya que llevaba más de un año preso sin que se le pudiera celebrar juicio debido a su estado no procesable, y, ordenó su ingreso al Hospital de Siquiatría de Ponce. Posteriormente, en abril de 1969, luego de una vista sobre el estado del apelante, el tribunal concluyó que se encontraba mentalmente capacitado para someterse a juicio y procedió a señalar los casos para vista.

La prueba desfilada demostró que el apelante vivía con su esposa y sus hijos en el barrio Coto Laurel de Ponce. La noche de los hechos después de haber comido, el apelante pidió a una de sus hijas que fuera a buscar a su esposa, quien se encontraba de visita en la casa de su hijo Héctor Luis. Cuando la esposa subió le entró a machetazos. Al intervenir su hijo Héctor Luis, también lo acometió causándoles a ambos la muerte sin que mediara discusión alguna. La autopsia de la occisa Antonia Ortiz reveló múltiples heridas incisas de dos a nueve pulgadas de largo y la del cadáver del occiso Héctor Luis Colón cerca de 25 heridas incisas penetrantes y visceración del intestino. Una de las hijas del apelante testificó que el apelante estaba tranquilo, que al cometer los hechos estaba contento y se reía. Al preguntársele si el apelante tenía coraje, contesto: "Al contrario se reía". (T.E. págs. 72–73.)

---

(¹)También fue convicto y sentenciado por infracción a la Ley de Armas.

El testigo *Jacobo Albizu Guzmán*, vecino del apelante, testificó que conocía a éste como un hombre serio y cumplidor de sus deberes. También declaró que:

"Como al final del año, o a principios del año sesentisiete el hombre estaba desquilibrado, no sé si le pasaba algo o tenía algo, un hombre que actuaba diferente a como él acostumbraba a actuar, al extremo que conmigo hizo un pequeño negocio de un toro que tenía que me lo vendió y no quiso cobrarlo y a las dos semanas se presentó a casa y tuve que darle el toro." (T.E. págs. 121A a 122A.)

Otro testigo, *Juan Santos García*, declaró que para la fecha de los hechos el apelante estaba loco.

"Dígame una cosa en los días más o menos, en los meses cercanos al 25 de julio de 1967, usted notó algún cambio en la conducta de don Juan?

Bueno sí, lo conocí que estaba loco.

Lcdo. García:

¿Por qué dice que estaba loco?

Testigo:

Porque yo trabajaba con él.

¿Usted trabajaba con él?

Si y al cambiar la manera de mandarme yo noté que estaba loco.

¿Qué hacía?

Que me mandaba y me decía que una gente lo estaba velando.

¿Qué usted decía a eso?

Yo no sé, porque yo no veía a nadie.

¿No le decía donde estaba esa gente?

Debajo de una alcatarilla, al lado de él.

¿Y usted iba a ver?

Si, y no había nadie.

¿Usted le decía a él que no había nadie?

Seguro.

¿Y qué hacía él, qué le decía él a usted?

Me decía que estaba allí y como yo no veía a nadie le decía que no había nadie.

Lcdo. García:

¿Y dice usted que lo conoce hace como veinte años?

Testigo:

Como veinticinco.

¿Trabajando juntos cuánto tiempo llevaban?

Como 17 años.

¿Y esa conducta de él que usted dice que él decía que lo perseguían, que la gente estaba debajo de la alcantarilla, eso se repitió o fue una sola vez?

Como cinco o seis meses antes.

¿Cuantas veces él se expresó en esa forma?

Muchas veces. (T.E. págs. 129A–131A).

Otro testigo, *Manuel Bonilla Santiago*, declaró:

"Yo lo conozco que ha sido un hombre bueno un hombre humilde, un hombre de trabajo y a los cuatro o cinco meses antes de los sucesos yo diría que estaba diciendo disparates.

¿Que manifestaba él?

El decía que lo estaban velando.

¿Se lo decía a usted?

Sí, que había gente en la alcantarilla y yo buscaba y no encontraba a nadie. (T.E. pág. 148.)

Hay otros testimonios que describen aspectos anormales en la conducta del apelante para la fecha de los hechos.[2] Todos los testigos describen al acusado como un hombre trabajador, honrado y bueno.

El siquiatra, Dr. Juan Marino Román, examinó al apelante 10 meses después de los hechos y llegó a la conclusión de que no estaba capacitado para entrar a juicio. La evaluación siquiátrica demostró que el apelante padecía de una reacción esquizofrénica. El 17 de febrero de 1969 más de un año y medio después de cometer los hechos se hizo una nueva evaluación al apelante y se encontró en remisión parcial de síntomas.

En *Pueblo* v. *Alsina*, 79 D.P.R. 46 (1956), expresamos que por consideraciones de orden público la ley presume

---

[2] Véanse los testimonios de Andrés Almodóvar: ". . . ya últimamente yo le decía, 'no te puedo atender' y cogía y me iba porque me salía con disparates y eso". (T.E. pág. 138 A.) También véase el testimonio de Flor Aguirre Collazo. (T.E. pág. 144.)

que toda persona acusada de delito está en su sano juicio al momento de cometer los hechos. Esta presunción de sano juicio releva al Ministerio Público de probar la capacidad mental de un acusado. No obstante, dicha presunción puede ser controvertida. En el caso de autos, efectivamente lo fue, como hemos visto, con el testimonio de varios testigos sobre la conducta anormal del acusado en fechas cercanas a los hechos y por el relato de la propia hija del acusado sobre la actitud del apelante al cometer los hechos imputados—contento, sin coraje y con risa. Controvertida así la presunción por el apelante, recaía sobre el Ministerio Público el peso de la prueba sobre el hecho de la cordura del acusado, hecho que tenía que probar como cualquier otro, más allá de toda duda razonable. No es sostenible la posición del Procurador General en su informe al efecto de que la evidencia presentada por el apelante no fue suficiente para controvertir la presunción de sano juicio. El apelante rebatió eficazmente la presunción.

El Procurador General arguye que el Ministerio Público presentó abundante prueba para establecer la cordura del apelante al momento de cometer los hechos. Hemos examinado detenidamente el récord y no estamos de acuerdo. La prueba que al respecto aparece del récord consiste de la vaga expresión de la testigo Gladys Colón Cruz, hija del apelante, de que no notó nada anormal en relación a su papá, y que éste nunca estuvo recluido en institución para personas dementes. (T.E. págs. 62 y 63.) Sin embargo, la forma en que esta misma testigo describe el comportamiento de su padre al momento de los hechos—contento, sin coraje, se reía—no es el de una persona normal. También la testigo Norma Iris Cruz Aguirre, yerna del acusado, testificó a preguntas del fiscal de si había notado algo que le llamara la atención en cuanto al comportamiento del apelante, declaró que no. (T.E. pág. 86.) Pero también en el contrinterrogatorio declaró que nunca tuvo conversaciones prolongadas con

el apelante, que solamente le saludaba cuando se encontraban y que no podía decir nada sobre la condición en que se encontraba el apelante.

El otro testigo presentado por el fiscal sobre este punto fue José M. Rivera, quien a preguntas del fiscal de si había notado algo anormal en la conducta del apelante contestó: "No, señor." (T.E. pág. 124.) Este mismo testigo en el contrainterrogatorio declaró que no conocía bien al apelante, que no sabía donde trabajaba y que nunca había hablado con él. (T.E. pág. 134.)

Dicha prueba, es claramente insuficiente para establecer más allá de toda duda razonable la salud mental del apelante, razón por la cual no puede prevalecer el fallo condenatorio.

La absolución del apelante por razón de incapacidad mental no significa que éste será puesto en libertad inmediatamente. Han muerto ya, en manos del apelante, dos inocentes seres humanos ligados a él por vínculos de sangre y de afecto. Es evidente que su enfermedad mental puede constituir un grave riesgo para la comunidad. *Es por eso que al revocar la sentencia apelada el apelante continuará recluido bajo la custodia del alcaide de la cárcel y el tribunal de instancia dará cumplimiento a la Regla 241 de Procedimiento Criminal.* (3)

El Juez Presidente Señor Negrón Fernández no intervino.

---

(3) Dicha Regla dispone:

"Si el jurado absolviere al acusado por razón de incapacidad mental, y tuviere el tribunal base razonable para creer que el acusado en ese momento continúa incapacitado, iniciará los trámites para hacer la determinación correspondiente, siguiendo el procedimiento establecido en la Regla 240. El tribunal podrá ordenar que el acusado permanezca bajo la custodia del alcaide de la cárcel hasta tanto terminare dicho procedimiento. Si el tribunal determinare que el acusado continúa mentalmente incapacitado, ordenará que sea recluido en una institución apropiada hasta que cese su incapacidad, y si determinare lo contrario, ordenará que sea puesto en libertad."