EL PUEBLO DE PUERTO RICO, apelado, *v.* DIONISIO MARCANO PÉREZ, acusado y apelante.

*Número:* CR-83-63 *Resuelto:* 15 de enero de 1986

---

918

*Dina Orlando*, abogada del apelante; *Américo Serra, Procurador General Interino, Miguel A. Santana Bagur, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Sr. Dionisio Marcano apeló una convicción por tribunal de derecho donde alega que una vez creada una duda razonable de que el acusado no estaba en su sano juicio cuando cometió los actos imputados, el Ministerio Público no probó más allá de duda razonable que estaba cuerdo. Resolvemos que se

cometió el error imputado y revocamos la sentencia del ilustrado foro de instancia.

## I

Dionisio Marcano Pérez, el acusado apelante, resultó convicto por tribunal de derecho, de cuatro cargos por el delito de robo, [1] dos infracciones al Art. 6, dos infracciones al Art. 8, una infracción al Art. 8A y una infracción al Art. 32, todos de la Ley de Armas. [2] El tribunal de instancia lo sentenció a cumplir concurrentemente penas de reclusión de veinte años en cada uno de los cargos por robo, cinco años por cada una de las infracciones al Art. 6, cinco años por cada una de las infracciones al Art. 8A y seis meses por la infracción al Art. 32.

La prueba de cargo consistió en el testimonio del Lic. Osvaldo Villanueva Díaz, del Lic. Carlos H. Dapena, del Sr. Luis Alberto Figueroa y de la Srta. Yolanda Acevedo Hernández, todos perjudicados en el caso, y del agente Francisco Miranda. Sus testimonios establecieron la siguiente cronología de eventos: El 29 de abril de 1982 los licenciados Villanueva Díaz y Dapena se encontraban en su oficina, la cual compartían en aquel entonces con el licenciado Segal. Les acompañaban la señorita Acevedo y el señor Figueroa. A eso de las 4:00 p.m. se presentó el acusado apelante, junto a otra persona no identificada, y procuró al licenciado Segal, quien no se encontraba en esos momentos. El acusado, quien estaba pulcramente vestido y lucía una apariencia acicalada, informó que necesitaba ver al licenciado Segal para pagarle un dinero, ya que éste lo iba a representar legalmente en una vista preliminar que se iba a celebrar en su contra por un caso de tentativa de asesinato. En el momento en que el licenciado Villanueva Díaz solicitó que le permitiera ver la denuncia en su contra, el acu-

[1] Art. 173 del Código Penal, 33 L.P.R.A. sec. 4279.
[2] 25 L.P.R.A. secs. 416, 418, 418a y 442, respectivamente.

sado extrajo de un maletín un revólver Magnum calibre 357, a la vez que su acompañante sacó una carabina calibre 30-30 de no más de quince pulgadas de largo.

Luego de preguntar por artículos de valor y dinero, se apropió de un reloj y dinero en efectivo del licenciado Villanueva, de un revólver calibre 38 y dinero en efectivo del licenciado Dapena, de la cartera y prendas de la señorita Acevedo y de prendas y dinero en efectivo del señor Figueroa. En el caso particular de la señorita Acevedo, el acusado le preguntó si una prenda era auténtica o de fantasía. También inquirió por el teléfono interior, el cual procedió a desactivar. Cortó además las líneas de todos los teléfonos. Al marcharse, el acusado les ordenó a todas sus víctimas que se tiraran al piso y contaran hasta cien, advirtiéndoles que iba a poner un artefacto explosivo en la puerta de la oficina, el cual estallaría si abrían ésta antes de finalizar el conteo determinado. Toda la operación efectuada por el acusado y su acompañante duró de quince a treinta minutos.

El Ministerio Público presentó prueba directa para demostrar la cordura del acusado, mediante testimonio de las víctimas. Sobre el proceder del acusado en el transcurso de los hechos arriba relatados, los testigos declararon que pudieron observar que él daba las órdenes, no estaba nervioso y se encontraba calmado, coherente, orientado y alerta; que se notaba consciente de lo que estaba haciendo. Referente a su conducta al momento de ser arrestado y trasladado desde su hogar al cuartel de la Policía, el agente Miranda testificó que se comportó tranquilamente todo el tiempo y que durante el viaje conversaba de manera normal e hilvanaba ideas.

Por su parte, el acusado, quien no contradijo la prueba del Ministerio Fiscal, alegó que era inimputable por razón de incapacidad mental. A tales fines, presentó su propio testimonio y el de su psiquiatra, el Dr. Miguel A. Cubano.

El doctor Cubano, quien al momento del juicio le brindaba servicios profesionales al acusado como parte del programa

conocido por *Fee Basis* que ofrece la Administración de Veteranos, declaró que desde 1975 ó 1976 trataba al acusado cuando éste fue ingresado a distintas instituciones para enfermos mentales, Hospital de Psiquiatría Forense y Penal y el Hospital Nuestra Señora de los Ángeles.

El doctor Cubano diagnosticó que por varios años el acusado había padecido de esquizofrenia paranoide crónica. Después de una extensa orientación al tribunal sobre esta enfermedad, el doctor Cubano testificó que el 13 de abril de 1982, dieciséis días antes de los hechos, el acusado apelante visitó sus oficinas. Fue acompañado de su padre y le dijo que se sentía bien. Posteriormente, el 17 de mayo de 1982, diecinueve días después de los hechos, el acusado volvió a visitar al doctor Cubano. En el informe escrito sobre tal visita, el doctor hizo las siguientes observaciones: "Viene a cita en el día de hoy acompañado de un Oficial de Custodia. Nuevamente está en la Cárcel. Tiene unas ideas de referencia y persecución muy delirantes. Cuando pasaba frente al radio dice: Voz le enviaba vibraciones místicas. El es un enviado. La Ley no es justicia. Muy verborrecio. Mezcla con ensalada de palabras. Está psicótico circunstancial. Está en Bayamón." (Pág. 38, transcripción del testimonio del doctor Cubano.)

Explicó el doctor Cubano que la esquizofrenia es una enfermedad que afecta el sistema nervioso. Ésta consiste en un trastorno en el cual hay o puede haber alteraciones en el pensamiento, la conducta, la forma de relacionarse y de visualizar la realidad, y el cuidado personal. Entre los distintos tipos de esquizofrenia se encuentra la que padece el acusado, o sea, la paranoide. Ésta se encuentra presente cuando se dan uno o varios de los siguientes síntomas: (1) delirios de persecución; (2) delirios de grandeza; (3) delirios de celos, y (4) alucinaciones, las cuales pueden ser de persecución y/o de grandeza.

Indicó que en el caso del acusado apelante, éste ha exhibido las cuatro características de la esquizofrenia paranoide:

en ocasiones ha tenido ideas de persecución, o sea, que la gente está en su contra y le quieren hacer daño; ha exhibido ideas de grandiosidad al creer que es un enviado de Dios y que sus actos están controlados u ordenados por algo superior al hombre; también ha sufrido de alucinaciones auditivas en las que él escucha voces que le ordenan realizar ciertos actos.

Explicó el doctor Cubano que un brote psicótico ocurre cuando los síntomas de la enfermedad que padece el acusado se presentan de forma más aguda. Para que haya psicosis, además de los síntomas de ansiedad, tensión, hostilidad o retraimiento, el enfermo tiene que estar alucinado. Por tal razón, en ese momento se le considera que está divorciado de la realidad. No obstante, una persona puede estar psicótica y no demostrarlo a los demás. En contraposición, el estado de remisión ocurre cuando el paciente ha mejorado y los síntomas disminuyen en intensidad. Véase American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 3ra ed., Washington, D.C., APA, 1980.

A preguntas directas del abogado de la defensa, el doctor Cubano expresó que la conducta de una persona con un padecimiento de esquizofrenia paranoide crónica podría verse afectada hasta el punto de no poder discernir sobre la naturaleza de sus actos y perder todo control sobre ellos.

En cuanto a los actos delictivos imputados al acusado Marcano, el doctor Cubano expresó: "Por el expediente que vemos de él, esta es una persona que ha estado sumamente enferma por años. Su condición en lugar de mejorar, pues, es lo de esperar, ha ido deteriorando continuamente. Estos delirios y estas alucinaciones en este tipo de pacientes se van haciendo más crónicos, más frecuentes, y ya a la altura que está Dionisio, a pesar de que es un hombre joven, pues prácticamente dominan su vida y dominan su pensamiento. O sea, que cualquier acto que él cometa en un momento dado es como consecuencia de esa enfermedad." (T.E., pág. 42.) Sobre el proceder del acusado el día de los hechos, el doctor Cubano testi-

ficó que éste no era inconsistente con su condición mental y, por tanto, su conducta por sí sola no estableció que comprendiera la criminalidad de sus actos o poder conformar éstos al mandato de la ley.

Por último, el doctor Cubano explicó que una persona puede estar acicalada y encontrarse psicótica. De igual manera, una persona puede estar toda desaliñada y encontrarse en un estado mental normal.

Al ser contrainterrogado por el fiscal, el doctor Cubano explicó que una persona que está alucinando, no necesariamente tiene que estar diciendo disparates o ser incoherente en sus pensamientos. O sea, que se puede estar psicótico y no demostrarlo al comportarse normalmente ante los demás. Explicó que un esquizofrénico paranoide puede tener momentos en que distinga entre el bien y el mal y sea responsable de sus actos. No obstante, en un caso de la cronicidad del acusado tales momentos son muy pocos y cortos de duración ya que el pensamiento delirante le ocupa la mayor parte del tiempo.

Por último, testificó el acusado, quien relató cómo percibía los hechos que se le imputaban. A estos efectos expresó que desde hace tiempo era vigilado por los fiscales y la ley. Al intensificarse la vigilancia, cuando se disponían a atacarlo a él y a su familia, se le ordenó que se armara para una posible guerra. Narró una serie de procedimientos por los cuales pasó. Le dieron el nombre de Imaim; que lo buscara con la seña 666, la cual encontró; que estaba usando una oficina en la misma calle de Radio Voz, transmitiendo y programando al pueblo con ultra sonido. Se refirió a esas personas en la oficina donde ocurrieron los hechos como el enemigo, a excepción de Yolanda —la testigo Acevedo Hernández— de quien dijo era inocente. Explicó que pidió hacerse invisible dos veces y en dos ocasiones se materializó. Citó al Éxodo 25 en que Jehová ordenó a Moisés que tomara oro, plata y cobre, lo cual ellos recogieron para ofrendárselo a Imaim, y que luego lo ofren-

daron al mar. Dijo que la única ley es la de la luz y a la ley del hombre se refirió siempre como la antigua ley.

Al ser repreguntado por el fiscal, indicó que él no tenía un Magnum, sino una VZ1 israelí, una subametralladora "de las que usamos los comandos". Expresó que entendió lo que dijeron los testigos y al irlos nombrando el fiscal, calificó al licenciado Dapena como inocente. De su compañero indicó que era un comando, o célula, y que no lo ha vuelto a ver. También dijo que sabía dónde estaba, que estaba en prisión, de qué se le acusaba y de la fianza que se le impuso. Reconoció al licenciado Segal entre el público que se encontraba en la sala y de forma alterada preguntó qué hacía él ahí.

## II

La controversia jurídica en este caso está limitada a determinar cuánta prueba tiene que ofrecer el Ministerio Público para probar más allá de duda razonable que el delito fue cometido por el acusado en su sano juicio cuando la defensa ha ofrecido suficiente prueba pericial sobre su incapacidad mental para impugnar la presunción de cordura.

A pesar de la complejidad del problema de salud mental, corresponde a los tribunales hacer determinaciones sobre la inimputabilidad de un acusado por incapacidad mental en casos como éste. La psiquiatría moderna y el desarrollo de drogas y medicamentos ha resultado en una evolución impresionante en el tratamiento del paciente mental y en su eventual rehabilitación. Estos cambios han afectado positivamente la administración de la justicia criminal, no solamente en el procesamiento sino también en las fases de rehabilitación y tratamiento de confinados. La psiquiatría moderna y el desarrollo de drogas y medicamentos han hecho que evolucionen rápidamente los conocimientos sobre los problemas e impedimentos mentales y el tratamiento tanto del retardado mental como del paciente con otras incapacidades. Estos desarrollos han tenido un efecto profundo en la administración de la jus-

ticia criminal que se enfrenta al problema de qué hacer con incapacitados mentales que han cometido crímenes, pero que mediante tratamiento puede restaurárseles su sanidad mental. A. Gómez, *El sistema de justicia criminal y el sistema de salud mental*, Informe preparado para la Conferencia Judicial de 1983. El problema para los tribunales se complica porque todavía no tenemos suficiente información sobre la mente humana para poder predecir la peligrosidad de una persona y hay posiciones conflictivas sobre la percepción del problema entre los psiquiatras.

La evolución de la psiquiatría moderna también ha afectado profundamente las determinaciones sobre la inimputabilidad de los incapacitados mentales y las medidas de seguridad post sentencia cuando prevalece esta defensa. Uno de los problemas más difíciles que siempre ha confrontado el Derecho penal es la formulación de la defensa de inimputabilidad. A través de la historia las cortes han adoptado diversos criterios para determinar la locura, comenzando con la distinción entre los locos, los furiosos y los desmemoriados del Derecho romano y el antiguo Derecho español; luego la Regla M'Naghten y recientemente la del Instituto Americano de Derecho (*American Law Institute*). Véase D. Nevares-Muñiz, *Derecho Penal Puertorriqueño—Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, págs. 235–243.

## III

El Art. 30 del Código Penal, 33 L.P.R.A. sec. 3152, establece que no es imputable de delito aquel que al momento de los hechos, a causa de enfermedad o defecto mental, careciere de capacidad suficiente para comprender la criminalidad de sus actos o para conducirse de acuerdo al mandato de la ley. Esta disposición proviene de la Sec. 4.01 del Código Penal Modelo del Instituto Americano de Derecho (*Model Penal Code—American Law Institute*). En la nota explicativa a la misma se dispone:

To be held irresponsible, the individual must, as a result of a mental disease or defect, either lack substantial capacity to appreciate the criminality [wrongfulness] of his conduct or lack substantial capacity to conform his conduct to legal requirements. The standard does not require a total lack of capacity, only that capacity be insubstantial. An individual's failure to appreciate the criminality of his conduct may consist in a lack of awareness of what he is doing or a misapprehension of material circumstances, or a failure to apprehend the significance of his actions in some deeper sense. Wrongfulness is suggested as a possible alternative to criminality, though it is recognized that few cases are likely to arise in which the variation will be determinative. An individual is also not responsible if a mental disease or defect causes him to lack substantial capacity to conform his conduct to the requirements of the law. This part of the standard explicitly reaches volitional incapacities.

Surge de lo anterior que la determinación de inimputabilidad por razón de incapacidad mental puede ser el resultado de defectos en la capacidad de la persona, tanto a nivel cognoscitivo como volitivo. También resulta importante destacar que la carencia en la capacidad del imputado no tiene que ser total. Sólo es necesario demostrar que la persona no cuenta con capacidad suficiente para comprender la criminalidad de sus actos o de conformar éstos al mandato de la ley. Véase Nevares-Muñiz, *op. cit.* págs. 235–245.

Con respecto a la capacidad mental del imputado, hemos resuelto que la ley presume la cordura de éste. Siendo así, el fiscal no está en la obligación de presentar prueba sobre su capacidad mental para delinquir. No obstante, de presentarse prueba suficiente que establezca duda razonable sobre la cordura del acusado al momento de los hechos, la mencionada presunción queda rebatida. La prueba a tales efectos puede ser presentada por el acusado o surgir de la ofrecida por el Pueblo para establecer su caso. Una vez rebatida la presunción de cordura, recae sobre el Ministerio Fiscal el peso de presentar prueba que demuestre más allá de duda razonable

la capacidad mental del imputado al momento de los hechos. *Pueblo* v. *Alsina,* 79 D.P.R. 46, 60 (1956) ; *Pueblo* v. *Rivera Raquel,* 95 D.P.R. 564, 569 (1967) ; *Molina* v. *Jefe Penitenciaría,* 96 D.P.R. 191, 198 (1968) ; *Pueblo* v. *Colón Morales,* 100 D.P.R. 40, 43 (1971) ; *Pueblo* v. *Reyes Acevedo,* 100 D.P.R. 703, 709 (1972). La prueba requerida a estos fines es aquella que establezca en la conciencia del juzgador la certeza moral y firme convicción sobre su imputabilidad. *Pueblo* v. *Dávila Alonso,* 85 D.P.R. 450, 453 (1962) ; *Pueblo* v. *Carrasquillo Carrasquillo,* 102 D.P.R. 545 (1974).

■ Es de rigor señalar que el mero hecho de que se presente prueba pericial para rebatir la presunción de sanidad mental no le impone de manera absoluta al Ministerio Fiscal la obligación de también ofrecer prueba pericial para refutar la de la defensa. (³) Conocida es la regla que establece que el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. *Pueblo* v. *Bonelli,* 19 D.P.R. 75 (1913) ; *Pueblo* v. *Dones,* 56 D.P.R. 211, 222 (1940) ; *Pueblo* v. *Sánchez,* 79 D.P.R. 116, 121 (1956) ; *Velázquez* v. *Ponce Asphalt,* 113 D.P.R. 39, 48 (1982). Es suficiente en derecho aquella prueba de cargo, sea o no pericial o una combinación de ambas, que demuestre más allá de duda razonable la cordura del acusado. La naturaleza y cantidad de la prueba que ha de presentar el Pueblo para contradecir la traída por la defensa para establecer la inimputabilidad, dependerá de la contundencia y robustez de esta última.

---

(³) Véanse *Wright* v. *United States,* 250 F.2d 4 (D.C. Cir. 1957) ; *Brock* v. *United States,* 387 F.2d 254 (5to Cir. 1967) ; *United States* v. *Shackelford,* 494 F.2d 67 (9no Cir. 1974) ; *United States* v. *Coleman,* 501 F.2d 342 (10mo Cir. 1974) ; *United States* v. *Dube,* 520 F.2d 250 (1er Cir. 1975) ; *State* v. *Cano,* 436 P.2d 586 (Ariz. 1968) ; *State* v. *Davis,* 158 Conn. 341, 260 A.2d 587 (Super. Ct. 1969) ; *People* v. *Harrington,* 22 Ill. App. 3d 938, 317 N.E.2d 161 (Appell. Ct. 1974) ; *People* v. *Woodworth,* 366 N.Y.S.2d 707 (Sup. Ct. 1975) ; *Com.* v. *Needly,* 444 A.2d 1199 (Pa. Super. 1982).

 Para ayudar al juzgador a determinar la condición mental del acusado, tanto el Ministerio Público como la defensa pueden hacer uso de testigos legos. El testimonio de éstos puede ser descriptivo sobre los hechos percibidos o "en forma de opiniones o inferencias" siempre que "estén racionalmente basadas en la percepción del testigo y que sean de ayuda para el mejor entendimiento de su declaración o para la determinación de un hecho en controversia". Regla 51 de Evidencia. En cuanto a la admisibilidad de este último tipo de testimonios —opiniones o inferencias inmediatas— la jurisprudencia de este Tribunal ha sido muy liberal al permitir un variado tipo de declaraciones. Véase E. L. Chiesa, *Práctica Procesal Puertorriqueña*, San Juan, Pubs. J.T.S., 1985, Evidencia—Vol. I, págs. 235-237, y casos allí citados. [4]

## IV

· Cuando se plantea la defensa de locura, la determinación final sobre la capacidad mental del acusado es una cuestión de hecho a ser dilucidada por el juzgador de éstos. *Pueblo* v. *Sánchez*, supra, pág. 122; *Pueblo* v. *López Rivera*, 109 D.P.R. 160, 167 (1979). No obstante, ello no significa que tal dictamen esté inmune de error y, por ende, fuera del alcance de nuestra facultad revisora. *Pueblo* v. *Pagán Díaz*, 111 D.P.R. 608, 621 (1981). Sobre este particular, en *Pueblo* v. *Carrasquillo Carrasquillo*, supra, págs. 551-552, expresamos:

---

[4] En Estados Unidos algunos tribunales han permitido que testigos legos ofrezcan su opinión sobre el estado mental de un acusado si se demuestra que conocían tan íntimamente y por suficiente tiempo a la persona que podía emitir un juicio informado. III *Wharton's Criminal Evidence* Sec. 609, pág. 175 (1972); *United States* v. *Segna*, 555 F.2d 226 (9no Cir. 1977); *State* v. *Brown*, 676 P.2d 757 (Kan. 1984); *State* v. *Smith*, 310 S.E.2d 320 (N.C. 1984); *Curry* v. *State*, 611 S.W.2d 745 (Ark. 1981). Sin embargo, en este caso no hay una controversia sobre la admisibilidad de opiniones de testigos legos, ya que los testimonios de las víctimas se limitaron a observaciones sobre su conducta durante el robo que duró quince minutos.

Hemos dicho en repetidas ocasiones que los juzgadores de hechos nos merecen respeto y confiabilidad en la apreciación imparcial de la prueba. *Pueblo* v. *Rosario Cintrón,* 102 D.P.R. 82 (1974) ; *Pueblo* v. *Nevárez Virella,* 101 D.P.R. 11 (1973) ; *Pueblo* v. *Rodríguez Hernández,* 91 D.P.R. 183, 203 (1964). Con ello no podemos significar que los juzgadores de hechos no se equivoquen. De ahí en que en muchos casos no hemos vacilado en dejar sin efecto un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado. *Pueblo* v. *Meléndez Rolón,* 100 D.P.R. 734 (1972) ; *Pueblo* v. *Rivera Arroyo,* 100 D.P.R. 46 (1971) ; *Pueblo* v. *Torres Rolón,* 99 D.P.R. 970 (1971) ; *Pueblo* v. *Rodríguez González,* 99 D.P.R. 904 (1971) ; *Pueblo* v. *Bonilla Medina,* 99 D.P.R. 128 (1970) ; *Pueblo* v. *Cruz,* 58 D.P.R. 33 (1941) ; *Pueblo* v. *Viana,* 41 D.P.R. 413 (1930).

Hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila.

En el caso de autos se estableció mediante prueba pericial no refutada que el acusado venía padeciendo desde hace varios años de una esquizofrenia paranoide crónica. [5] Expresó el perito psiquiatra que una persona que sufra de tal padecimiento y que en un momento dado incurra en conducta constitutiva de delito bajo los efectos de un brote psicótico carece de la capacidad suficiente para conformar su conducta al mandato de la ley o comprender la legalidad de la misma.

Concluyó el doctor Cubano, quien al momento de los hechos venía tratando profesionalmente al acusado por casi siete años, que dada la severidad de su padecimiento mental, éste carecía de la suficiente capacidad mental para poder ser considerado imputable de delito al momento de los hechos. Al

---

[5] El testimonio pericial vertido a estos efectos fue confirmado por extensa prueba documental.

apelante, quien actuaba bajo los efectos de alucinaciones y delirios que le inducían a pensar que recibía órdenes supremas que no podía desobedecer y que sus ejecutorias no eran incorrectas, le era imposible conformar sus actos al mandato de la ley y comprender la criminalidad de los mismos.

Una vez quedó controvertida la presunción de sanidad mental del acusado por la anterior prueba y su propio testimonio, recayó sobre el Pueblo la obligación de establecer más allá de duda razonable su imputabilidad. El fiscal pretendió descargar tal deber mediante prueba no pericial consistente en el testimonio de los perjudicados en el presente caso. Como estas personas no conocían íntimamente y por suficiente tiempo al acusado no podían emitir un juicio informado sobre su estado mental. Su testimonio se limitó a describir la conducta del acusado según la observaron ellos. Ninguno ofreció información sobre su estado mental.

Luego de un detenido análisis de toda la prueba que tuvo ante sí el tribunal sentenciador, concluimos que el Pueblo no demostró más allá de duda razonable la capacidad mental del apelante para responder criminalmente por los actos imputados. Aun cuando aceptamos que prueba sobre el comportamiento y el proceder de un imputado al momento de los hechos podría ser suficiente para establecer su cordura, consideramos que en el caso de autos no lo fue así. Máxime, cuando la prueba pericial no controvertida estableció que la conducta desplegada por el acusado al momento de perpetrarse el robo es del todo compatible con su condición emocional, que le hace inimputable, por lo que, no obstante tal proceder, el acusado no tenía la capacidad suficiente para comprender la legalidad de sus actos o conformar los mismos al mandato de la ley.

El acusado apelante presentó prueba convincente sobre su inimputabilidad, la cual estuvo basada en testimonio pericial, su propio testimonio y un extenso historial clínico psiquiátrico. El Pueblo, por su parte, pretendió establecer la capacidad mental del acusado mediante prueba que resultó ser insu-

ficiente a la luz de la ofrecida por la defensa. Los efectos de esta última no se vieron disminuidos por el poco impacto que pudo haber tenido aquélla sobre ésta.

■ Consideramos que dada la contundencia con que la inimputabilidad del acusado quedó demostrada, se requería la presentación de prueba más robusta por parte del Ministerio Fiscal para establecer su caso. El Estado tenía que presentar testimonio pericial que demostrara que al momento de los hechos el acusado no estaba alucinado y que dado su historial médico el paciente tenía la capacidad de comprender la criminalidad de sus actos o de conformar éstos al mandato de la ley.

■ Nos sorprende que aunque el Ministerio Fiscal sabía que el acusado había planteado la defensa de locura desde la vista preliminar, no hubo la preparación necesaria para refutar la prueba pericial del acusado. El fiscal se limitó a utilizar testigos legos y a contrainterrogar brevemente al perito del acusado. En el futuro el Ministerio Fiscal debe utilizar adecuadamente los recursos de peritaje que tiene disponibles el Estado para ayudar a los tribunales en la determinación sobre la capacidad mental de un acusado. Examinada la prueba testifical desfilada, la determinación del tribunal apelado sobre la capacidad mental del acusado al momento de los hechos no representa el balance más racional y justiciero, por lo que erró como cuestión de derecho al imponer responsabilidad criminal al apelante sin que se estableciese la misma más allá de duda razonable. *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56, 60 (1966); *Pueblo* v. *Carrasquillo Carrasquillo*, supra, pág. 552; *Pueblo* v. *Pagán Díaz*, supra, pág. 621.

Por los fundamentos expuestos, *se dictará sentencia revocatoria y se absolverá al acusado apelante. Éste continuará recluido bajo la custodia del Alcaide de la Cárcel y el tribunal de instancia dará cumplimiento a lo dispuesto en los Arts. 66 al 70 del Código Penal, 33 L.P.R.A. secs. 3351 a 3371, de con-*

*formidad con la Ley Núm. 61 de 5 de julio de 1985 que establece el procedimiento para la imposición de la medida de seguridad del incapacitado mental.*

El Juez Asociado Señor Irizarry Yunqué emitió voto particular uniéndose a la opinión del Tribunal. El Juez Presidente Señor Pons Núñez está conforme con la opinión del Tribunal y, además, se une al voto particular del Juez Asociado Señor Irizarry Yunqué. El Juez Asociado Señor Negrón García disiente con opinión. El Juez Asociado Señor Rebollo López no intervino.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

"Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones [o teorías] que nadie más creería." *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

A la luz de un análisis crítico e integral de la prueba testifical y documental presentada entendemos —al igual que el ilustrado tribunal sentenciador— que el Ministerio Fiscal estableció más allá de duda razonable la comisión de los hechos imputados al apelante Dionisio Marcano Pérez, y su capacidad legal para comprender la criminalidad de esos actos.

Su tesis en contrario, refrendada en la opinión de este Tribunal, aparte de que no mereció crédito, se basa en dos premisas erróneas: (1) que la determinación sobre la capacidad mental —procesal y fácticamente— fue rebatida, y (2) que tal condición sólo puede demostrarse mediante testimonio pericial. Nada más lejos de la realidad. Veamos.

I

Nuestro ordenamiento jurídico se apuntala en la presunción de capacidad mental. *Pueblo* v. *Colón Morales*, 100 D.P.R. 40, 43 (1971); *Pueblo* v. *Rivera Raquel*, 95 D.P.R. 564, 569 (1967); *Pueblo* v. *Alsina*, 79 D.P.R. 46, 60 (1956).

Como excepción a ese principio nuestras normas procesales y sustantivas contemplan la condición de alienación mental como razón de inimputabilidad.

En lo pertinente, el Art. 30 del Código Penal reza:

> No es imputable el que en el momento del hecho, a causa de enfermedad o defecto mental, careciere de capacidad suficiente para comprender la criminalidad del acto o para conducirse de acuerdo con el mandato de ley. 33 L.P.R.A. sec. 3152.

A tal efecto si se presenta prueba suficiente generadora de una duda razonable en torno a la capacidad mental de un acusado, incumbe entonces al Ministerio Público establecer su sano juicio. *Pueblo* v. *Reyes Acevedo,* 100 D.P.R. 703 (1972); *Molina* v. *Jefe Penitenciaría,* 96 D.P.R. 191 (1968); *Pueblo* v. *Alsina,* supra. Ahora bien, la incapacidad mental, como eximente de responsabilidad, es una cuestión fáctica. Su "determinación final corresponde al juzgador de hechos, bien sea juez o jurado". *Pueblo* v. *López Rivera,* 109 D.P.R. 160, 167 (1979); *Pueblo* v. *Sánchez,* 79 D.P.R. 116, 122 (1956).

Para dirimir probatoriamente esa controversia son admisibles las opiniones de testigos legos y peritos. *Pueblo* v. *Báez,* 67 D.P.R. 301, 303 (1947); *Sucn. Gómez* v. *Colón,* 63 D.P.R. 104, 105 (1944). Véanse H. B. Rothblatt, *Defense and the Direct and Cross-Examination of the Psychiatric Witness,* compilado en C. H. Wecht, *Legal Medicine Annual: Nineteen Seventy-One,* Nueva York, Appleton-Century-Crafts, 1971, págs. 301, 319–320; 2 *Underhill's Criminal Evidence* Sec. 457, págs. 1147–1148 (1956); 1 *Wharton's Criminal Evidence* Sec. 222, págs. 470–475 (1966); 3 Wharton's, *op. cit.,* Sec. 609, págs. 175–177 (1972); *Competency of Testimony of Nonexperts on Question of Sanity or Insanity in Criminal Cases,* 72 A.L.R. 579 (1931); *State* v. *Brown,* 676 P.2d 757–761 (Kan. 1984); *State* v. *Smith,* 310 S.E.2d 320, 324 (N.C. 1984); *Curry* v. *State,* 611 S.W.2d 745, 747–748 (Ark. 1981).

La Regla 51 de Evidencia recoge este enfoque y permite, aun cuando un testigo no estuviere declarando como perito, su declaración en forma de opiniones o inferencias pero limitada a aquellas que *"estén racionalmente basadas en la percepción del testigo* y que sean de ayuda para el mejor entendimiento de su declaración o *para la determinación de un hecho en controversia"*. (Énfasis suplido.)

Aclarado este extremo, debemos recordar la regla elemental de que la opinión pericial no obliga al juzgador. Un tribunal puede rechazar las conclusiones de un perito. *Pueblo* v. *Dones*, 56 D.P.R. 211, 222 (1940) ; *Pueblo* v. *Sánchez*, supra, pág. 121. Basado en todas las declaraciones de testigos oculares sobre la conducta y comportamiento de un acusado al momento de los hechos, el juez puede arribar a sus propias conclusiones respecto a si éste estaba bajo la influencia incapacitante de una enfermedad mental. "Ha de tenerse presente, por estas razones, tanto para el médico como para el jurista que intenten la aplicación de lo patológico a lo jurídico, que ha de quedar en todo caso reservada al juez la última resolución, en forma de sentencia, sobre las conclusiones del primero." W. Weygandt, *Psiquiatría Forense*, 2da ed., México, Ed. Nacional, 1967, pág. 15.

## II

En virtud de estos principios analicemos la prueba. Primeramente no debe haber duda respecto a la veracidad de la aportada por el Ministerio Fiscal. Ésta consistió en los testimonios [1] de Osvaldo Villanueva Díaz, Carlos H. Dapena, Luis A. Figueroa, Yolanda Acevedo Hernández y Francisco

---

[1] Las apreciaciones y conclusiones de estos testigos no pueden tomarse livianamente. Uno de ellos, el licenciado Villanueva, declaró sobre su preparación académica. Aprobó durante su bachillerato un curso de Psicología Anormal en la Facultad de Ciencias Sociales, U.P.R. Además expuso sus experiencias profesionales en casos de insanidad mental como fiscal y abogado de defensa, incluyendo sus observaciones derivadas de innumerables visitas a pacientes en hospitales de psiquiatría.

Miranda. La misma fue aquilatada y creída por el tribunal sentenciador. En ningún momento ha sido cuestionada ante nos. Dicho de otro modo, se acepta que el apelante Marcano Pérez observó la siguiente conducta al cometer los delitos:

El 29 de abril de 1982 los licenciados Villanueva Díaz y Dapena se encontraban en su oficina, la cual compartían en aquel entonces con el licenciado Segal. Los acompañaban la señorita Acevedo y el señor Figueroa. A eso de las 4:00 p.m. se presentó el acusado apelante, *junto a otra persona no identificada,* y procuró al licenciado Segal, quien no se encontraba en esos momentos. El acusado, quien *estaba pulcramente vestido y lucía una apariencia acicalada, informó que necesitaba ver al licenciado Segal para pagarle un dinero,* ya que éste lo iba a representar legalmente en una vista preliminar que se iba a celebrar en su contra por un caso de tentativa de asesinato. En el momento en que el licenciado Villanueva Díaz le solicitó que le permitiera ver la denuncia en su contra, el acusado *extrajo de un maletín* un revólver Magnum calibre 357, *a la vez que su acompañante sacó una carabina* calibre 30-30 de no más de quince pulgadas de largo.

Luego de *preguntar por artículos de valor y dinero,* se *apropió de un reloj y dinero* en efectivo del licenciado Villanueva, *de un revólver calibre 38* y *dinero* en efectivo del licenciado Dapena, *de la cartera y prendas* de la señorita Acevedo y *prendas y dinero en efectivo* del señor Figueroa. En el caso particular de la señorita Acevedo, *el acusado le preguntó si una prenda era auténtica o de fantasía.* También *inquirió por el teléfono interior,* el cual *procedió a desactivar. Cortó además las líneas de todos los teléfonos.* Al marcharse, el acusado les *ordenó a todas sus víctimas que se tiraran al piso y contasen hasta cien,* advirtiéndoles que iba a poner un artefacto explosivo en la puerta de la oficina, el cual estallaría si abrían ésta antes de finalizar el conteo determinado. *Toda la operación efectuada por el acusado y su acompañante duró de quince a treinta minutos....*

. . . los testigos declararon que pudieron observar que él [acusado] *daba las órdenes, no estaba nervioso y se encontraba calmado, coherente, orientado y alerta; que se notaba*

*consciente de lo que estaba haciendo.* Referente a su conducta al momento de ser arrestado y trasladado desde su hogar al cuartel de la Policía, el agente Miranda testificó que *se comportó tranquilamente todo el tiempo y que durante el viaje conversaba de manera normal e hilvanaba ideas.* (Énfasis suplido.)

Insistimos en que esta prueba no fue impugnada. En apoyo de la defensa de insanidad se presentó el testimonio del psiquiatra Dr. Miguel A. Cubano. En síntesis, éste atestó que desde el año 1976 trataba al apelante Marcano Pérez por un padecimiento de esquizofrenia paranoide crónica. Explicó los trastornos que esa condición generaba, a saber, alteraciones en: (1) el pensamiento; (2) la conducta; (3) forma de relacionarse, y (4) forma de visualizar la realidad. Indicó que esa conducta alteraba las relaciones familiares, con su comunidad y afectaba su cuido personal. La enfermedad podía variar diferentes procesos psicológicos como son el contenido y la forma de pensamiento, la percepción, el afecto, la relación con el mundo exterior y también alterar la conducta de movimientos, o la conducta psicomotriz. Específicamente declaró que Marcano Pérez tenía con frecuencia "ideas de referencia y de persecución, de que la gente está en contra de él, que le quieren hacer daño"; también, ideas de "grandiosidad" y de alucinaciones auditivas. Se refirió a los récords médicos del Hospital de Veteranos y del Hospital de Psiquiatría presentados en evidencia.

En cuanto a los delitos imputados, el doctor Cubano expuso que lo vio dos semanas antes de que los cometiera, el 13 de abril de 1982. En esa entrevista Marcano Pérez le dijo que se sentía bien. Le recetó una serie de medicamentos. Sobre el aspecto crucial de su capacidad, opinó que su comportamiento delictivo era compatible con su condición mental. Según su criterio, del mismo no podía establecerse que comprendiera la criminalidad de los actos. Sabía que Marcano Pérez fue usuario de marihuana. Desconocía que antes de estas acusaciones había sido sentenciado por robo armado por hechos acaecidos

el 12 de mayo de 1977. Aclaró que una persona como él, con diagnóstico previo de esquizofrenia paranoide crónica puede, en remisión de síntomas, distinguir entre el bien y el mal. Esa lucidez puede variar en tiempo, en su caso, entre media a tres cuartos de hora. Admitió que la enfermedad que padecía Marcano Pérez "no exime la culpa".([2]) Además, que con tratamiento continuo podía llevar una vida normal, inclusive la familiar y mantener el vínculo matrimonial y relaciones paterno-filiales. Atestó que Marcano Pérez, después de los hechos, mientras estuvo en la cárcel, empeoró, estaba con ideas de persecución y se mostraba muy "verborreico".

Finalmente, el apelante Marcano Pérez declaró. Su testimonio durante el juicio (17 meses más tarde), fue en torno a que su conducta respondió a un delirio de persecución y alucinación basado en que los fiscales lo vigilaban. Recibió órdenes de armarse para una guerra. Le dieron el nombre de Imaim y que lo buscara con la seña 666, la cual encontró; que estaban

---

([2])"P. O sea, en otras palabras, lo que yo quiero decir es que una persona sea quien sea y tenga cien por ciento de incapacidad de Veteranos, por defecto mental o que s[ea] esquizofrénic[a] paranoide, no tiene una licencia o un pasaporte para cometer cualquier tipo de acto delictivo y entonces automáticamente se le aplica la defensa de incapacidad mental. Eso no es así, no.

"R. No, a las personas . . . .

"P. Por que entonces, entonces la justicia lo que tendría que hacer sería no perseguirlo, no acusarlo [sic] a nadie.

"R. No.

"P. ¿Usted me entiende la pregunta?

"R. Sí, yo lo entiendo a usted. La enfermedad yo pienso que no exime la culpa. Lo que pasa es que tenemos que tener otras varas para medir, y esta persona que está enferma pero que es culpable, pues hay que proteger la sociedad también, pero hay que protegerlos a ellos también.

"P. Sí, la sociedad y a ellos también.

"R. Y a ellos, o sea, que la protección tiene que ser de ambas partes. Yo, mi recomendación siempre es de [sic] que las personas se les ponga en un tratamiento hasta que haya remisión real y más duradera, verdad. O sea, que se les obligue a seguir un tratamiento. Porque generalmente el problema con los pacientes, en general verdad, no s[ó]lo Veteranos sino en todos, es que en cuanto se sienten un poquito mejor abandonan el tratamiento o no lo siguen con la misma intensidad." (T.E., págs. 60–61.)

usando una oficina en la misma calle de Radio Voz, transmitiendo y programando al pueblo con ultra sonido. En su relato se refirió a las personas en esa oficina como el enemigo a excepción de Yolanda, la secretaria, de quien dijo era inocente. Pidió hacerse invisible dos veces y en dos ocasiones se materializó. Citó al Éxodo 25 en que Jehová ordenó a Moisés que tomara oro, plata, cobre, etc. y que ellos lo recogieron para ofrendárselo a Imaim, y que luego se lo ofrendó al mar; la tierra, el mar, en su día quiere lo que es de ella, que le pertenece, que salió de sus entrañas. Dijo que la única ley es la ley de la luz, a la ley del hombre se refería siempre como la antigua ley.

En el contrainterrogatorio dijo que él no tenía un Magnum sino una VZ1 israelí, subametralladora de las que usamos los comandos. Dijo que entendió lo que dijeron los testigos. Al irlos nombrando el fiscal calificó al licenciado Dapena como inocente. De su compañero dijo que era un comando, o célula, y que no le ha vuelto a ver.

### III

De la prueba de la defensa antes relacionada, independientemente del poco valor probatorio que le adjudicó el foro de instancia, según el testimonio del doctor Cubano, es innegable el historial clínico de esquizofrenia paranoide crónica del apelante Marcano Pérez. Sin embargo, tal como dicho galeno admitió, esa condición, en remisión de síntomas y a intervalos, le permitía a éste distinguir la criminalidad de sus actos y por ende no lo exime de culpa.

Sobre este extremo, la prueba *no contradicha* del Ministerio Fiscal demostró reiterada y satisfactoriamente al momento de los hechos una conducta compatible con la presunción de sanidad mental. Primeramente, Marcano Pérez demostró una conducta normal e inteligente. Estaba pulcramente vestido y con apariencia acicalada. Tenía escondida un arma de fuego, que sacó oportunamente y usó de manera efectiva.

Indagó y desactivó los teléfonos interiores y los exteriores. Inquirió y selectivamente se apropió de un revólver, prendas legítimas y dinero en efectivo. Estuvo calmado, coherente, orientado y alerta. Durante el robo y huida sus órdenes fueron precisas y exactas.

Segundo, el doctor Cubano no estuvo presente en sala cuando se desfiló la prueba testifical del Ministerio Fiscal. Aunque como perito —conforme las Reglas 56 y 58 de Evidencia— ésto no sería impedimento para opinar válidamente a base de una "pregunta hipotética" formulada con arreglo a la prueba antes aportada, según su propia admisión, ello le "habría ayudado quizás a tener un mejor cuadro de la persona [del acusado]". La situación tiende a debilitar seriamente el valor probatorio de su testimonio. Notamos que la pregunta central relativa a la capacidad mental del acusado, [3] en la cual el doctor Cubano fundó su opinión, no contenía todos los detalles y datos esenciales sobre el comporta-

---

[3] "P. Doctor, en este procedimiento desfiló evidencia en el sentido de que el paciente se introdujo en unas oficinas de unos abogados, eh, conversó primero con las personas que estaban en, eh, la recepcionista o la secretaria. Dijo que era un cliente de uno de los abogados. Eh, le dijeron que el abogado no estaba, pues, dijo que lo podía atender otro abogado. Estuvo conversando con los demás abogados, luego extrajo una, un arma, igual lo hizo otra persona que estaba con él. Esas personas fueron encañonadas[,] se les quitó, se les despojó de sus prendas y tuvieron que entregar los bienes materiales que tenían, etc. Y según uno de los testimonios de una de las personas, él salió al salón de espera y cerró una puerta y luego regresó, y luego se le dio órdenes de que contaran hasta cien antes de salir y salieron de allí. Este, eso en esencia es la evidencia que . . . los hechos según la evidencia que ha desfilado, lo que ha declarado los testigos. Yo le pregunto si esas actuaciones, según a grandes rasgos le he explicado, ¿para usted como psiquiatra indicarían o son indicativas de que este paciente en ese momento que estaba cometiendo esos actos, conocía la naturaleza criminal de esos actos y podía discernir en que esos actos eran contrario a la ley? ¿Si esos actos en sí son indicativos de que conocía que esos actos eran contrario a la ley?

"R. No, porque si él estaba actuando en ese momento por órdenes de unos delirios y de unas alucinaciones, él puede hacer todos esos gestos y cosas que usted ha explicado y sin embargo, eh, desconocer desde el punto de vista legal la importancia de los . . . ." (T.E., págs. 45–46.)

miento observado por los testigos de cargo durante la comisión de los delitos. En esta etapa apelativa tales lagunas fácticas son insubsanables.

Tercero, en teoría, su proceder dista mucho de ser el de un esquizofrénico paranoide crónico, dominado por una de las siguientes tendencias: (1) delirio de persecución; (2) delirio de grandeza; (3) delirio de celos, y (4) alucinaciones de persecución o grandeza. Weygant, *op. cit.*, págs. 349–350; R. R. Tilleard-Cole y J. Marks, *The Fundamentals of Psicological Medicine,* Inglaterra, M.T.P., 1975, pág. 192.

Cuarto, su comportamiento al perpetrar los delitos, también contrasta con su récord clínico. Éste refleja que durante las fases activas, su enfermedad se manifestaba siempre por agresividad, alucinaciones, ansiedad, ideas de persecución, desviación en espacio y tiempo, ideas suicidas, desaliño, tensión, incoherencia y hablador. Repetimos, durante el robo no exhibió ninguna de estas características que objetivamente podrían servir de signos visibles para un diagnóstico acorde a una patología real eximente.

Quinto, la forma en que fueron ejecutados los delitos dista mucho de su versión alucinante de génesis divina y bíblica. Denota que toda la operación fue consciente y previamente planificada. Resulta interesante notar el alto grado de conocimiento previo del apelante Marcano Pérez sobre la oficina del licenciado Segal. Al llegar a ésta lo procuró específicamente. Dio como excusa falsa que iba a pagarle un dinero para que lo representara en una vista preliminar en un caso en su contra por tentativa de asesinato. Curiosamente en ningún momento verbalizó en torno a la supuesta encomienda bíblica que recibiera. Tampoco se identificó como enviado de Dios ni actuó con rareza, extravagancia, anormalidad o de manera excéntrica. Aun cuando su encargo divino cubría recoger "oro, plata y cobre" para ofrendárselo a Imaim, el único dato objetivo relacionado con esta alegada alucinación —convenientemente traído— fue la sustracción de las prendas de oro

genuino y dinero en efectivo. Adviértase que descartó los otros metales carentes de valor: plata y cobre.

Sexto, en el fascinante mundo de la mente, la psicogénesis del robo patológico ha sido objeto de estudio. Con respecto a las ramificaciones del delito por impulso, ideación anormal (pueril, delirante), perturbación física (hambre y toxicomanía) u obsesión impulsiva, se acepta, en "general [que] el delito tiene ya caracteres en sí mismo que lo denuncian como un acto psicológico. En ese sentido son significativos ciertos datos: su instantaneidad, su ausencia de plan o su plan anormal, su falta de precauciones, la inutilidad de lo robado. La actitud del autor durante y después del hecho suele ya revelar al enfermo; la reiteración del mismo tipo de robo, ya sea por la forma de actuar o por el objeto robado, es a menudo un signo de valor". N. Rojas, *Medicina Legal*, 8va ed., Buenos Aires, El Ateneo, 1984, pág. 411.

Finalmente, existen dos detalles cruciales que militan contra la proposición de que Marcano Pérez no conocía la criminalidad de los actos o no podía comportarse de acuerdo al mandato de ley. El primero, que realizó los delitos en unión a un cómplice. Buscó ayuda para robar un arma, dinero y prendas de valor eficiente y selectivamente. Su compañero lo siguió fielmente y ejecutó satisfactoriamente sus instrucciones. Adoptó racionalmente un sinnúmero de precauciones. Y segundo, durante su comisión, en un momento dado preguntó si una prenda era legítima o de fantasía. El dato es un importante indicador. Paradójicamente, ¿cómo aceptar que fue capaz de diferenciar entre una joya buena o de fantasía, y no comprender la criminalidad de sus actos? Véase *Pueblo* v. *Rivera Raquel*, 95 D.P.R. 564, 570 (1967).

Recapitulando, todos los indicadores objetivos de la prueba del Ministerio Fiscal dejaron establecida claramente la imputabilidad del apelante Marcano Pérez. La prueba de la defensa no la afectó. En lo pertinente, el testimonio del doctor Cubano no puso en entredicho la presunción de capacidad. Por

el contrario, en lo que atañe al período crítico cercano —antes, durante y después del robo— esa prueba tiende a corroborar que estaba en remisión de síntomas. A tal efecto, hemos de enfatizar que dos semanas antes le comunicó al psiquiatra que "se sentía bien". Dicho galeno atestó que su enfermedad no le eximía de culpa. En su correcta perspectiva y alcance, su testimonio sólo se refirió a una probabilidad de que no pudiera distinguir entre el bien y el mal. *Pueblo* v. *Rivera Raquel*, supra. Al ser arrestado, y antes de ser ingresado en la cárcel, se comportó tranquilamente, conversaba normalmente e hilvanaba sus ideas.

En fiel juridicidad, carecemos de fundamentos válidos para revocar.[4] La apreciación del estado mental del apelante Marcano Pérez al cometer los hechos fue objeto de evaluación y apreciación directa por el tribunal sentenciador. Éste rechazó y no dio crédito a la defensa de locura. A nosotros tampoco nos convence. *Pueblo* v. *López Rivera*, 109 D.P.R. 160, 165 (1979). En apelación debemos respetar el dictamen de instancia y confirmar la sentencia. *Pueblo* v. *Rovira Ramos*, 116 D.P.R. 945 (1986).

—O—

Voto particular emitido por el Juez Asociado Señor Irizarry Yunqué al cual se une el Juez Presidente Señor Pons Núñez.

He dado mi conformidad a la opinión del Tribunal no obstante los argumentos de la ponencia disidente. Por ello me parece necesario que deje constancia de la razón de mi voto.

---

[4] Nuestro dictamen no niega el historial clínico previo de esquizofrenia paranoide crónica de Marcano Pérez. Simplemente reconoce que se demostró más allá de duda razonable capacidad "para comprender la criminalidad del acto" al momento de cometerlo. La prueba de cargo corroborada por la pericial, establece que estaba en remisión de síntomas.

Por lo tanto, la ejecución de la sentencia sería sin menoscabo del tratamiento que su condición, en cualesquiera de sus fases ameritara en el futuro, mediante coordinación entre el Hospital de Veteranos y la Administración de Corrección según recomienda el propio doctor Cubano.

No podemos pasar por alto que las actuaciones del apelante durante la comisión de los actos delictivos que nos ocupan impresionan como los de una persona cuerda, y en pleno control de sí mismo. Así lo concluiría un lego. Y así les impresionó a los testigos de cargo y al juez sentenciador. Ese modo de actuar del apelante es también la base de la ponencia disidente.

Empero, al pasar juicio sobre el estado mental de una persona, aunque se trate de una cuestión de hecho, se está en terreno especializado del campo de la psiquiatría. Un lego puede ser fácilmente inducido a error. Y en este caso, las explicaciones dadas por el psiquiatra Dr. Miguel A. Cubano, quien trataba al apelante desde el 1975 ó 1976, no habiendo sido contradichas se oponen como muralla infranqueable a que la aquilatación del testimonio de los legos lleve al convencimiento por sobre esa muralla, es decir, por sobre la duda razonable y más allá de ella, de que el apelante era responsable criminalmente de lo que hacía.

Baste reproducir las siguientes palabras del doctor Cubano (T.E., pág. 42):

Por el expediente que vemos de él, esta es una persona que ha estado sumamente enferma por años. Su condición en lugar de mejorar, pues, es lo de esperar, ha ido deteriorando continuamente. Estos delirios y estas alucinaciones en este tipo de pacientes se van haciendo más crónicos, más frecuentes, y ya a la altura que está Dionisio, a pesar de que es un hombre joven, pues prácticamente dominan su vida y dominan su pensamiento. O sea, que cualquier acto que él cometa en un momento dado es como consecuencia de esa enfermedad.

Como señala la opinión del Tribunal, ante tan tajante explicación el Ministerio Público no debió descansar únicamente en los testimonios legos. Pudo y debió consultar peritos psiquiátricos. El fiscal tenía que probar más allá de duda razonable que el apelante estaba cuerdo. A mi juicio no descargó esa responsabilidad.